**SLAYMAKER LOCK CO. v. REESE.**
No. 9555.

District Court, E. D. Pennsylvania.
June 3, 1938.

John A. Coyle and Harris C. Arnold, both of Lancaster, Pa., and Dowell & Dowell, Benj. B. Dowell, and Wm. S. Hodges, all of Washington, D. C., for plaintiff.

Christian E. Charles, of Lancaster, Pa., and Richard E. Babcock, of Washington, D. C., for defendant.

KIRKPATRICK, District Judge.

My conclusion is that the bill must be dismissed. I will briefly state the facts as I understand them, and add a statement of my reasons for the conclusion.

The bill states a number of causes of action. First is the alleged infringement of two patents for the mechanical structure of a padlock; second, the alleged infringement of two design patents; third, the alleged infringement of a registered trademark; and fourth, a charge of unfair competition.

The general fact background is as follows: The plaintiff is a corporation which I shall call Slaymaker, and the defendant is an individual whom I shall call Reese. The parties are both engaged in the manufacture of padlocks, have been for a number of years, both located in the same town, and are and have been for a long time in direct competition with one another. During that time both have been constantly engaged in improving their product and in bringing out new forms of padlocks, some of which have been patented and others not.

In the early part of 1934 the plaintiff made and sold (but did not then patent) two new types which were designed especially to meet a need for a cheap lock available for sale to chain stores. Shortly before this there had developed a less expensive alloy metal which could be adapted to die casting—a method of manufacture which could be more advantageously used than those in use prior to that time.

The first sale of what are known as its cylinder locks was made by the plaintiff on May 18, 1934, and the first sale of its warded locks on July 27, 1934. These locks were of attractive appearance, substantial, and satisfactory in every particular. They were good sellers to chain stores, and the plaintiff established a rather large business in their sale. The plaintiff also sold to retailers and hardware merchants, but, as I understand the testimony, the bulk of the sale of these locks was for the chain store trade. They were supposed to sell at 25 and 20 cents apiece, respectively.

Late in 1935 or early in 1936, Reese brought out two locks closely resembling Slaymaker's, both in mechanical structure and in outward appearance. He offered them to the chain stores at a lower price than the plaintiff, and began to cut into the plaintiff's business. The plaintiff first got knowledge of the defendant's sales and first began to feel the competition in the early part of 1936. Thereupon, a little less than two years after it had put the locks on the market, its president applied for the various patents in suit, and at the same time the plaintiff gave notice to the defendant of the application.

I have no doubt that Reese had the Slaymaker locks before him when he constructed the alleged infringing articles, and I have no doubt that he intentionally imitated their outside appearance. He may also have imitated the mechanism and internal structure. However, after the notice was received and at a time when suit was threatened but before suit was actually brought, Reese discontinued the manufacture and sale of all locks which imitated the plaintiff's as to the outward appearance. The locks which he has manufactured and sold since that time do not bear any real resemblance to the plaintiff's lock, although the internal construction of them is exactly the same as the locks which he made prior to his receiving notice.

That, I think, covers the general fact situation so far as it is necessary as an introduction to what follows.

Taking up the mechanical patents first; my conclusion is that both of these patents are invalid for want of invention. It may be said in a general way that this art reached its point of full development a good many years ago. Anyone who follows through the evidence in this case, which is by no means complete as to the prior art, must realize that for a number of years there has been practically nothing left to develop so far as the operation of the padlocks is concerned, and that the principles governing the actual operation have been understood and carried to a point of near perfection a long time ago, and that the art for a number of years has been at a stage where whatever improvements there are to be made are improvements along the line of structural changes by which the manufacture can be accomplished more easily or more readily, or by the use of cheaper materials, or the elimination of various structural parts so as to make the whole operation of constructing the locks cheaper and simpler. An illustration will be found in the adaptation of the locks to the method of die casting which we see in this case. So that in that field which I re-

fer to as the only field left—that is cheapening and improving the process of manufacture—it is plain that the margin of patentability has pretty nearly reached the vanishing point.

The 570 patent is an illustration of what I have said. All the major instrumentalities of the structure of that patent appear in the prior art. Roughly speaking, the padlock consists of, first, a shackle with its ejecting spring. Then there is a locking mechanism which consists of two main parts, a spring pawl which, when not operated by the key, clamps the shackle and holds it in place in a closed position, and a cylinder which by means of small discs, spring impelled, is held stationary and can only be revolved after a key has been inserted. When the key is revolved, the cylinder is revolved with it, and a cam on the top of the cylinder spreads the legs of the pawl spring and releases the shackle in that way. Another part of this locking mechanism, I suppose, would be the stop for the shackle which prevents it when released from being pulled entirely out of the padlock, in other words, lets it rise to a certain point so that the shorter leg can swing clear, and then holds it there.

The third major instrumentality, of course, is the casing which, prior to the time of these patents, had been reduced to two major parts—a part called the casing, and a front plate, or cover plate, which is clamped upon it by some mechanical means. Of course, there has always been an effort to make the padlock as solid as possible and yet leave room for the elements inside the case, and at the same time to use as little metal as is absolutely necessary, and the result of that has been that the casing has been cavitied and abutments have had to be left at various places for the seating of the lid or cover on the casement, so that you have a form of cavitied casing with abutments upon which the cover is seated as an old form in the art. All these major instrumentalities I find in the prior art in substantially the form in which they appear in both of the plaintiff's patents.

The 571 patent differs in operative principle from the 570 in that, instead of a cylinder which is revolved by drawing certain discs within itself by the key, the end of the key is thrust directly between the legs of the pawl, and when turned, itself operates to spread the legs of the pawl. The things that keep it from turning are a number of small guards or wards which project from the sides of the channel into which the key is thrust, and prevent it from being turned unless the notches of the key correspond precisely with the wards. This, again, is a mechanism which appears in the prior art. See Bohanan, 557,952; Fraim, 1,243,151; Sterling, 1,520,975. Reference may also be had to the stipulated prior art structures, Exhibits D, F and G.

Of course, I do not find any patent or structure in which everything appears exactly as it does in the plaintiff's two patents, but they are all present in the art, they are all present in combination, and what is most important is that in most of the prior art structures they cooperate and coact in exactly the same way that they do in both the plaintiff's patents. There is no new combined function produced by any part or any group of parts in the patents of the plaintiff.

The 570 patent contains just one feature which it is not possible to find closely anticipated in the prior art, and that is the member of the claimed combination which consists of a boss on the cover plate which extends through an opening in one of the side abutments and goes into a recess into the shackle and operates as a stop. The new thing about it is that it has a bearing rest upon the abutment through which it protrudes and so makes a slightly stronger stop, or offers perhaps more resistance to a pull on the shackle than if it was not so supported.

Just how necessary that is does not appear. It does not appear that any difficulty ever arose from breaking or pulling out the former stops which were used in other patents, either bolts, or pins, or knobs on the shackle itself engaging with the abutments, and, so far as operation goes, I doubt very much that anything is added by the support of the bearing on the abutment —certainly, nothing so far as the evidence in this case shows is very necessary so that feature does not modify the operation of the lock to any appreciable extent. It is entirely possible that it makes it a little simpler operation in casting the whole casing, although I don't see just how it has that advantage over those of the prior art structures in which it appears as integral with the casing and cast as part of the casing, for example, the Reese No. 7030, Stipulation Exhibit F.

In fact, it really comes down to the question of whether there was any additional function or new functional relationship created by having that small boss bear on the abutment through which it projects. I find no evidence that there was, or that the bearing in itself performs any new function, or that it does more than strengthen one of the elements of the combination.

■ As I said, that is the only new thing in the entire combination, and it does not affect the combined function of the elements at all. If it is a patentable improvement of a single element of a combination it certainly should have been claimed as such, and not as a part of the whole combination. See Lincoln Engineering Company of Illinois v. Stewart Warner Corporation, 58 S.Ct. 662, 82 L.Ed. 1008, decided by the Supreme Court of the United States March 28, 1938. But I do not hold that it would have been patentable even if claimed separately. I do not believe that it amounts to more than a strengthening of a structural part.

As to the 571 patent, this patent, as will appear by reference to the file wrapper, was obtained partly, at least, upon the argument that it was the first patent to show removable wards. As a matter of fact, there are to be found several references which show removable wards and which were not cited and were not before the Patent Office at the time the patent was granted.

The salient feature of this patent is the T-shaped channel formed by partitions, the vertical leg of which serves to hold the small ridges which guide the wards (although they are supported by slots in the front of the back of the padlock), and the horizontal leg the pawl spring. This structure is not new, as appears by reference to Slaymaker's own construction No. 7500, Stipulation Exhibit E. There may be some very slight advantage in having these wards supported by the ridges on two sides of the partition, but that, again, is merely an advantage in manufacture, as I see it, because it possibly assists in having them in position when the covers are clamped on, and, of course, they have to be put in different positions when different keys are used. However, I can't find that any invention is involved in that particular feature. It has no bearing whatever on the function of the lock, and whatever advantage it may give in the manufacture is so absolutely trifling as to be really invisible to me. This type of lock is not new by any means, and I am unable to predicate patentability upon the very, very slight difference, if any, which it exhibits over the prior art in connection with the seating and supporting of the wards.

Therefore, I make the conclusion of law that both of these patents, 2,048,570 and 2,048,571, are invalid for want of invention. This makes it unnecessary to determine the question of infringement, and no finding of fact or conclusion of law is made upon that point.

The design patents, in my opinion, clearly are not infringed. Taking 99,554; unless you give that patent the scope of a monopoly on all designs having vertical bars of different lengths on the face or in the corner of the plate, the defendant's designs do not infringe them, because he shows four bars extending half way across the front of the plate from one side only, and in a general way the design patent 99,732 is subject to exactly the same thought, because that design is not reproduced by the defendant with any very great degree of accuracy or similarity.

■ A design patent must be very narrowly construed when it comes to the question of general shape and contour of an article like a padlock, because, as is plain, there is bound to be a very narrow field of choice when you come to design a padlock, and when you have used oblong, circular and square types, you have pretty well covered the ground, and it would hardly do for one to monopolize those shapes and to force competitors to manufacture their padlocks in fantastic and unattractive shapes.

■■ A cross section of the defendant's locks is quite different from the design of the first of the patents (within the limits of its being an elongated oval shape) and the same thing is generally true with regard to the second design patent. It is not necessary to go into the question whether invention lies in the adoption of the general contour of the padlocks of the design patents, although I am very doubtful of that. The point in this case is that they are not infringed.

[8, 9] Taking up the registered trademark; as this Court held in the Sleight Metallic Ink Case, 52 F.2d 664, registration under the Act of 1920, 15 U.S.C.A.

§§ 85, 121–128, supplies no evidence of title, nor any prima facie proof of validity. This trade-mark stands exactly as though it were claimed as a common law trade-mark. It is clearly invalid because it consists substantially in its entirety of descriptive matter. The words "Five Disc Cylinder. Made in U. S. A." are the only words appearing upon it, and that describes exactly the product to which it is attached, and describes the defendant's product as well as the plaintiff's. If this trade-mark were given validity it would be a serious embarrassment to competitors in advertising, or even in stating correctly and honestly what the nature of their article was. The whole question of the validity of this trade-mark as a registered trade-mark is ruled, in my judgment, by the decision of this Court in the Metallic Ink Case.

This leaves the question of unfair competition to be dealt with. At the outset of this, we are met with a question of jurisdiction. There is no diversity of citizenship, and the jurisdiction, if any, must depend upon the ruling announced in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. In other words, the Court acquires jurisdiction because there is in the case a substantial Federal question raised by the existence of the design patent and the registered trade-mark, even though these might be determined all invalid.

However, I agree with the defendant that this element would not give jurisdiction of any acts of unfair competition prior to the dates of these patents (Stark Bros. Nurseries & Orchards Co. v. Stark, 255 U.S. 50, 41 S.Ct. 221, 65 L.Ed. 496), and we are, therefore, upon this question brought down to a rather small period of time, that is, the period of time from May 5, 1936, until the summer of that year when the defendant discontinued the use of their alleged infringing structures. I do not find any evidence that the defendant has made or sold since that time padlocks bearing a deceptive similarity to the plaintiff's. However, that would not be ground for refusing an injunction.

Additional facts may be found in connection with the charge of unfair competition.

In the first place, I am satisfied that the defendant's padlocks—certainly Cut No. 1 and probably Cuts Nos. 2 and 3 of Stipulation Exhibit A—bear a deceptive similarity to the plaintiff's lock.

Secondly, I think that the defendant undoubtedly copied the plaintiff's lock with the intention of producing a padlock which looked like it. Because of the peculiar character of the business involved, I am not ready to say that the defendant intended or had in mind palming off upon the public his lock as that of the plaintiff, but he certainly intended to compete with the plaintiff, and as part of his program of competition he wanted a lock which closely resembled the lock of the plaintiff, for whatever advantage that would give him. The plaintiff's lock was of attractive form and appearance, and, of course, Reese had the right to copy its style, so far as that was in the public domain.

Thirdly, Slaymaker, in this case, finds itself in a somewhat peculiar situation when it comes to assert good will as to this particular article. There is no evidence whatever that the trade-mark or style of the lock have acquired any secondary meaning. It will be noted that the plaintiff's name does not appear anywhere upon it. That was deliberately withheld. As the plaintiff's sales manager explained, it was believed that it would injure its business with its general customers if it were known that it sold to chain stores, and so the plaintiff did not want it to be known by the public generally that it was selling to chain stores because the knowledge would probably get to its other customers. It felt that it was of more advantage to it to forego whatever good will might arise from attaching its name to its article than to try to establish in the mind of the public any connection between itself and its padlock. One incidental advantage of this policy was that the plaintiff needed to spend only a negligible amount for advertising.

So, we have a situation where the trade-mark in its essence consists of descriptive matter not subject to appropriation and where there has been no advertisement or course of business which has in any way connected the article with the plaintiff. No secondary meaning has arisen, and no personal good will in the sense of a connection in the mind of the public between the maker and the product.

The best statement that can be made for the plaintiff's case is this: that it has sold a good article through the chain stores; that the public may have become

familiar with the articles by means of its form and appearance and the matter which appears upon it; that the defendant by imitating it has made it possible for the chain stores to sell to the public the defendant's article under the impression, not that the public is buying the plaintiff's article, but that it is buying the same article which it was accustomed to buy. There is no evidence to indicate that the chain stores have attempted or will attempt to mislead the public in any way, but the defendant has at least made it easier for them to switch to his article without putting them to the necessity of announcing or explaining the change. Thus, in a remote way, the defendant may have benefited by the excellence (if it is present) of the plaintiff's article. However, there is no evidence that the public, generally, has suffered in any way by the substitution; there is nothing to show that the defendant's article is not just as satisfactory as the plaintiff's. Nobody has suggested that the chain store buyers—nine or ten of them—have been in any way misled or deceived by the similarity into believing that they are buying the Slaymaker lock when, as a matter of fact, they are buying the Reese lock. Nor is there any evidence that the public wants the plaintiff's locks because they are the plaintiff's. The most that can be said is that some people may possibly believe that they are buying the same kind of goods they bought some time ago, when, as a matter of fact, they are buying something different which may or may not be just as good.

The point is that unless the plaintiff can show some damage or some injury arising from the imitation either to himself or some fraud upon the public, he can not maintain this bill, and I do not think that he has been able to show it. He has an invalid trade-mark; he has a legend which contains descriptive matter only, not subject to his appropriation. He has failed to show that it has acquired any secondary meaning in the minds of the public, and it seems to me that the major element of his case fails.

The statements of fact contained in this opinion may be taken as special findings, and the statements of law may be taken as conclusions of law, under the Equity Rule 70½, 28 U.S.C.A. following section 723.