**DECKERT et al. v. INDEPENDENCE SHARES CORPORATION et al.**

No. 218.

District Court, E. D. Pennsylvania.

May 18, 1939.

764

Harry Shapiro, of Philadelphia, Pa., for complainants.

Robert F. Irwin, Jr., and Frank Rogers Donahue, of Donahue, Irwin, Merritt & Gest, both of Philadelphia, Pa., for defendants.

Francis H. Bohlen, Jr., of Saul, Ewing, Remick & Saul, of Philadelphia, Pa., for defendant Pennsylvania Co.

KALODNER, District Judge.

The complainants are owners and holders of certain contract certificates purchased from Capital Savings Plan, Inc., since merged with and now Independence Shares Corporation, a Pennsylvania corporation.

The principal defendant is the Independence Shares Corporation, a trust and investment corporation, organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its principal place of business in Philadelphia. The individual defendants are officers and directors of the Independence Shares Corporation.

The Pennsylvania Company for Insurances on Lives and Granting Annuities is a banking corporation, organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania, with its principal place of business in Philadelphia. The Pennsylvania Company, &c., is trustee under several agreements between the trustee and the Independence Shares Corporation and certain of its predecessor companies.

The complainants seek the appointment of a receiver for the Independence Shares Corporation, with full power and authority to take into possession all the property and assets of the Independence Shares Corporation, and the trust assets held by The Pennsylvania Company, &c., under its agreements with the Independence Shares Corporation. They also seek determination of liabilities, liquidation and distribution and dissolution of Independence Shares Corporation.

The complainants ground their action on alleged misrepresentations and fraudulent statements made to them at the time they purchased Capital Savings Plan contract certificates from the predecessor of the Independence Shares Corporation. They aver that they and other plan holders have been, and are being defrauded by the Independence Shares Corporation.

The complaint also avers that the Independence Shares Corporation is insolvent.

The jurisdiction of this court is invoked under its general equitable and receivership powers, and under Section 22(a) of the Act of Congress of May 27, 1933, entitled the "Securities Act of 1933," as amended and supplemented (Act of May 27, 1933, c. 38, Title 1, Section 22(a), 48 Stat. 86, U.S.C.Title 15, Section 77v(a), 15 U.S.C.A. § 77v(a).

As previously stated, the principal offices of the Independence Shares Corporation, and of The Pennsylvania Company, &c., are within the Eastern District of Pennsylvania. All the individual defendants are residents of the Eastern District of Pennsylvania.

Eight of the nine complainants are residents of the Eastern District of Pennsylvania. The ninth complainant, Abe Zubrow, is a resident of the State of New Jersey. All the complainants individually own $2,000 contract certificates, on which sums ranging from $80 to $500 have been paid in installments.

Prior to December 31, 1938, the Independence Shares Corporation was a wholly-owned subsidiary of Capital Savings Plan, Inc. The officers and directors of the two corporations were substantially the same. On December 31, 1938, there was a merger of Capital Savings Plan, Inc., and Independence Shares Corporation, under which the latter acquired all of the liabilities, assets, functions, and business of Capital Savings Plan, Inc., which was an investment and trust corporation, organized, existing, and doing business under and by virtue of the laws of the Commonwealth of Pennsylvania. Capital Savings Plan, Inc., was originally incorporated in Pennsylvania on October 15, 1931.

Independence Trust Shares registered with the Securities and Exchange Commission prior to the merger of the two companies on May 2, 1938, under the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. The registration was with respect to Independence Trust Shares Purchase Plans, providing for maximum aggregate pay-

ments of $6,720,000, with a maximum of 5600 Monthly Payment. Plans, and $480,-000 under a maximum of 960 Full Paid Plans.

From January, 1932, to April, 1938, and under three different trust agreements, the defendant Capital Savings Plan, Inc., issued and sold to members of the public residing in the Eastern District of Pennsylvania and elsewhere, securities, namely Capital Savings Plan Contract Certificates, which are participations in an investment trust or scheme commonly known as an "Installment Investment Plan," for which The Pennsylvania Company, &c., is trustee and defendant Capital Savings Plan, Inc., was sponsor and distributor.

These certificates are monthly payment plans issued and sold in unit denominations of $1200 providing for the payment of $10 per month on a periodic or installment basis over a period of ten years. They could be purchased in one-half units of $600 or any multiple thereof. They could be secured with life insurance protection providing that upon the death of the purchaser the insurance company would pay to the trustee in one lump sum the installment payments remaining unpaid, which sum ranges downward on a $1200 unit certificate, from $1190 to $10.

The trustee upon receipt of each periodic or installment payment deducted and still deducts the various fees and charges. The fees include a service fee of $60 on a $10 per month unit certificate, deducted from the equivalent of the first nine monthly payments; a trustee fee of 25 cents per $10 payment or fraction thereof, deducted from each monthly payment; and, on installment payment plans with insurance, an insurance fee deducted in decreasing amounts from each monthly payment.

The remaining balance after fees and charges are deducted was and is used by the trustee at the direction of the defendant Independence Shares Corporation and its predecessor, Capital Savings Plan, Inc., to acquire from defendant Independence Shares Corporation, Independence Trust Shares for the account of each purchaser. These shares are interests in an installment investment trust for which The Pennsylvania Company, &c., is trustee and of which defendant Independence Shares Corporation is issuer, sponsor and depositor.

Each Independence Trust Share represents a 1/1000 interest in a deposit unit previously created by defendant Independence Shares Corporation with funds borrowed or supplied by it. The deposit unit consists of one share each of the common stock of forty-two corporations and cash accumulations to the proper proportion of a distribution account. The price at which Independence Trust Shares were and are sold to the Trustee for the account of the purchasers of Capital Savings Plan Contract Certificates was not and is not the actual creation cost of each share, but was and is computed upon the last sales price of each of the forty-two common stocks which make up the deposit unit, as of the day before the Trustee makes the purchase, to which was and is added odd-lot brokerage, commissions and taxes. To the total of this was and is added an arbitrary charge or load of nine per cent (now reduced to 7½ per cent) and any distributable accumulations which may then be applicable to the deposit unit. This nine per cent arbitrary charge or load was divided, 1½ per cent to defendant Independence Shares Corporation and 7½ per cent to the defendant Capital Savings Plan, Inc., and was a source of income to the defendant Capital Savings Plan, Inc. through the ten-year term in addition to the $60 service charge which is deducted from the first nine payments or their equivalent. Independence Trust Shares were and are subject to an additional charge of 2½ per cent of currently distributable income and currently distributable principal, which charge is deducted semi-annually and paid to the trustee.

The Installment Investment Plan of Capital Savings Plan, Inc., was in effect a trust upon a trust, with two sets of trustees' fees, and with two sets of sponsors' fees, expenses, charges and other costs of operation deducted from the moneys paid in by the purchasers and from the earnings derived from the underlying common stocks in the portfolio of Independence Trust Shares. The Independence Trust Shares purchased by the trustee are held in a common portfolio, but the account of each purchaser is credited with the shares or fractional shares to which he is entitled. At any time the purchaser may receive the Independence Trust Shares which are credited to his account or the liquidating value thereof in cash. The liquidating value of each share was and is computed at the bid price maintained by defendant Independence Shares Corporation and was

766

and is based upon the market bid price of the forty-two common stocks underlying the shares plus the applicable portion of the distributable accumulations and less odd-lot brokerage, commissions and taxes. This price is customarily approximately ten per cent less than the then offering price of the shares.

Defendant Independence Shares Corporation maintains offices in Philadelphia and Pittsburgh, Pennsylvania, and has general agencies in other cities and sub-divisions of Pennsylvania. Defendant Independence Shares Corporation is represented, and its certificates were offered and sold in defined territories, by junior salesmen, senior salesmen and general agents. Their sole remuneration is dependent upon commissions, and over-riding commissions, based upon the amount of certificates sold, the initial commission being payable only after delivery of the certificates and being contingent thereafter upon receipt by the trustee of subsequent installment payments. Many of the salesmen were part-time representatives, such as office workers, public employees, factory workers, school teachers and insurance salesmen.

The offer and sale of Capital Savings Plan Contract Certificates was discontinued on April 9, 1938. However, the holders of approximately 95 per cent of all the outstanding Capital Savings Plan Contract Certificates are continuing and will continue to send in their periodic cash installments to the trustee, for the purchase of Independence Trust Shares, and the trustee uses and will continue to use the aggregate of these periodic cash installments to purchase Independence Trust Shares from defendant Independence Shares Corporation for the accounts of said holders.

On May 2, 1938, defendant Independence Shares Corporation filed with the Securities and Exchange Commission a registration statement covering a new issue of Independence Trust Shares to be used as the underlying medium of investment for all Capital Savings Plan Contract Certificates outstanding, and as the underlying medium of investment for a new issue of certificates called Independence Trust Shares Purchase Plans. A registration statement covering these latter certificates was filed by Independence Shares Corporation on May 19, 1938.

The Independence Trust Shares Purchase Plans are participations in an investment trust or scheme commonly known as an "Installment Investment Plan," for which The Pennsylvania Company, &c., is custodian and defendant Independence Shares Corporation is sponsor. They are substantially similar to the Capital Savings Plan Contract Certificates issued and sold by Capital Savings Plan, Inc., during the period December, 1932, through April 9, 1938. By contract dated May 14, 1938, defendant Capital Savings Plan, Inc., was underwriter for and had the exclusive right until January 1, 1939, to offer, sell and distribute Independence Trust Shares Purchase Plans.

After January 1, 1939, Independence Shares Corporation itself sponsored, issued and sold Independence Trust Shares Purchase Plans, taking over and using substantially the same sales persons, selling organization and selling practices of Capital Savings Plan, Inc. Defendant Independence Shares Corporation absorbed the assets, liabilities and functions of Capital Savings Plan, Inc. and Capital Savings Plan, Inc., was dissolved.

The following is an excerpt from the Prospectus (June 8, 1938; also January 3, 1939) issued by the Independence Shares Corporation:

"The Independence Trust Shares Purchase Plan is a systematic program by means of which an individual may purchase Independence Trust Shares and thus acquire an interest in a well-diversified list of representative American corporations.

"Independence Trust Shares are shares of an investment trust of the fixed type issued under an Agreement and Declaration of Trust dated as of April 2, 1930 entered into between the Sponsor of these Plans and The Pennsylvania Company for Insurances on Lives and Granting Annuities, as Trustee, which Agreement and Declaration of Trust is entirely separate from the Independence Trust Shares Purchase Plans. The Independence Trust Shares are created in units of 1000 shares by depositing with the Trustee one share of the common stocks of each of 42 corporations and cash accumulation to the proper proportion of a distribution account. Each Independence Trust Share, therefore, represents 1/1000th interest in one share of each of the 42 corporations and a proportionate interest in the distribution account. The 42 corporations include banks, railroads, oil companies, utilities, industrial companies and insurance companies, a complete list of

which will be found in the Prospectus relating to Independence Trust Shares which is attached to this Prospectus. These corporations were chosen for their comparative stability of earning power and for their future possibilities."

The above excerpt, it will be noted, describes the Independence Trust Shares as "an investment trust of the fixed type." The "fixed type" of trust has a fixed list of securities which the management cannot change. This description of "fixed type" in the Prospectus is at variance with the description of the nature of the trust shares given by the President of the Independence Shares Corporation, and by counsel for The Pennsylvania Company, &c., in the preliminary hearing of this complaint. The President of Independence Shares Corporation, Alfred H. Geary (pages 120, 121, notes of testimony), described the trust shares as "an investment trust of the semi-fixed type." The "semi-fixed type" trust is one with a fixed list of securities, with the management allowed to eliminate those securities which in their judgment are insecure, but not to add others; they must stay within the fixed list for all their investments.

Francis H. Bohlen, Jr., Esquire, counsel for The Pennsylvania Company, &c. (page 56 notes of testimony), described the trust shares as a "limited management" type, and as a "fixed trust subject only to limitations."

It may be appropriate to say at this point that there are some 20,000 plan holders who have paid in approximately $4,000,000.

As above stated, the Independence Shares Corporation registered with the Securities and Exchange Commission in 1938. Subsequent to the registration, on June 22, 1938, the Securities and Exchange Commission filed a complaint against the Capital Savings Plan, Inc., and the Independence Shares Corporation, alleging that: "for at least three years last past the defendant, Capital Savings Plan, Inc., has engaged, and is now engaging, and the Independence Shares Corporation is about to engage, in acts and practices which constitute violations of Section 17(a) of the Securities Act of 1933 [15 U.S.C.A. § 77q (a)]."

The complaint asked that the two defendants named, and:
"their officers, agents, employees, and sales personnel be enjoined and restrained from * * * obtaining money or property by means of untrue statements of material facts or omissions to state facts necessary in order to make the statements made in the light of the circumstances under which they were made not misleading and particularly concerning:

"(a) Any comparison of the operation of the plan to the operation of a savings bank account or other type of deposit account.

"(b) The extent to which and the time or times at which a purchaser may liquidate his securities or otherwise obtain the return of moneys paid in.

"(c) The worth or liquidating value of the security at the end of 10 years or after a total of 120 payments have been completed or at any other time subsequent to the purchase thereof.

"(d) The relation of The Pennsylvania Company for Insurances on Lives and Granting Annuities or any other trustee to the defendants or to the operation of the plan, or the responsibility of such company or any other trustee under the plan.

"(e) Any guarantees or assurances of profit or against loss inherent in or attached to the security or any opportunities afforded thereunder.

"(f) The life insurance feature of the plan.

"(g) The nature and the character of the operation of the plan as a medium of investment or method for the installment or periodic purchase of trust shares or the manner in which moneys paid in thereon by purchasers thereof are invested in common stocks or the amount and percentage of all charges, fees, commissions and costs which are deducted from said moneys prior to such investment or from the income or return of principal of such investment
"or any other untrue statements of material facts or omissions to state material facts necessary to be stated in order to make the statements made in the light of the circumstances under which they are made not misleading, similar to those specifically set forth above or of similar purport or object."

After answer filed, making general denial, the Capital Savings Plan, Inc., and Independence Shares Corporation joined with the Securities and Exchange Commission in a consent decree June 23, 1938, restraining the two corporations from en-

gaging in the practices complained of by the Commission.

In essence, the instant proceeding is based on the same grounds as was set forth in the 1938 Securities and Exchange Commission complaint. The testimony adduced at five of six hearings held in the instant case overwhelmingly substantiates the allegations in the two proceedings.

Before discussing this testimony and evidence, it is necessary to dispose of a motion to dismiss filed by the Independence Shares Corporation and the individual defendants, and a motion to dismiss filed by The Pennsylvania Company, &c.

I shall consider the two motions in the order named.

Independence Shares Corporation and the individual defendants moved to dismiss upon the grounds:

(a) That the amount in controversy is less than $3000;

(b) That there was not the requisite diversity of citizenship; and

(c) That there is no jurisdiction in equity or for the appointment of a receiver because the complainants were unsecured simple contract creditors who had not reduced their claims to judgment and failed to realize upon execution process.

All these contentions are without merit.

Paragraph 1 of the bill of complaint contains jurisdictional averments stating that relief is sought under, inter alia, Section 22(a) of the Securities Act of 1933, as amended and supplemented, being the Act of May 27, 1933, Chapter 38, Title 1, Section 22(a), 48 Stat. 86, U.S.C. Title 15, Section 77v(a), 15 U.S.C.A. § 77v(a). The section referred to reads as follows:

"(a) The district courts of the United States, the United States courts of any Territory, and the district court of the United States for the District of Columbia shall have jurisdiction of offenses and violations under this title and under the rules and regulations promulgated by the Commission in respect thereto, and, concurrent with State and Territorial courts, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the sale took place, if the defendant participated therein, and process

in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

It becomes necessary in this connection to consider Chapter 38, Title 1, Section 12, of the Act (15 U.S.C.A. § 77l), which reads:

"Any person who—

"(1) sells a security in violation of section 77e, or

"(2) sells a security (whether or not exempted by the provisions of section 77c, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

And finally, Chapter 38, Title 1, Section 16, of the Act (15 U.S.C.A. § 77p): "The rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist at law or in equity."

 It is evident that the allegations of the bill, which are assumed to be true for the purposes of the discussion of the motions to dismiss, bring the complaint within the provisions of the law quoted. For, according to those allegations, these defendants sold securities by means of a prospectus or oral communication, both of which included untrue statements of material facts or omitted to state material facts necessary to make the statements not misleading: wherefore under Section 12 they are liable to the purchaser for the amount of the consideration paid, with interest.

It is not necessary to look beyond this particular statute for jurisdiction in this court upon the allegations in the bill. Section 16, already quoted, provides specifically that the rights and remedies provided by the subchapter (Chapter 38, Title 1) "shall be in addition to any and all other rights and remedies that may exist at law or in equity." It becames a matter of no moment, therefore, whether or not diversity of citizenship exists, and whether or not the amount in controversy exceeds $3000 exclusive of interest and costs, and it is unnecessary to pass upon those questions. See Wyman v. Wallace, 201 U.S. 230, 26 S. Ct. 495, 50 L.Ed. 738; Steidle v. Reading Company, 3 Cir., 24 F.2d 299, 301; Slaymaker Lock Co. v. Reese, D.C.E.D.Pa., 24 F.Supp. 69, 73, where suits arising under the laws of the United States were entertained by Federal courts despite the lack of diversity of citizenship.

We pass now to the other question raised by the motion to dismiss: That complainants are not entitled to come into equity because they are unsecured simple contract creditors who have neither obtained judgments nor issued executions thereupon.

The fallacy in this contention lies in the assumption that the complainants are unsecured simple contract creditors. They are not.

This is a class bill. The class is composed of the various persons who have subscribed to the investment plans of Independence Shares Corporation, and of Capital Savings Plan, Inc., now merged with the former. The Pennsylvania Company, &c., holds legal title to a vast amount of securities *for the benefit of the subscribers.* Specific, substantial rights in this property —the securities—are given to the purchasers. The following is culled from the Prospectus (January 3, 1939):

"Rights of Purchasers
"Applicable to All Plans:

"(1) Remittance of Distributions: A Purchaser may from time to time instruct the Custodian to remit the distributions upon his Trust Shares and may subsequently direct that future distributions be applied to the purchase of Trust Shares.

"(2) Partial Withdrawal: A Purchaser may at any time withdraw part of his Trust Shares or direct the Custodian in writing to sell part of his Trust Shares and remit the net proceeds. Subsequently and at any time prior to complete withdrawal, such Purchaser has the right to redeliver to the Custodian the Shares withdrawn to be held for his account.

"(3) Complete Withdrawal: A Purchaser may at any time terminate his Plan by surrendering the same to the Custodian with written instructions either to deliver his Trust Shares to him or upon his order or to sell his Trust Shares and remit the net proceeds to him or upon his order. If the Purchaser directs the delivery of his Trust Shares, sufficient Trust Shares and fractions thereof will be sold to pay all authorized deductions and leave no fractional Trust Shares, and the net balance will be paid in cash.

"(4) Continuation of Custodianship: After a Purchaser has completed his payments he may permit the Custodian to retain custody of his Trust Shares, either applying distributions to the purchase of additional Trust Shares or remitting the same.

"(5) Transfers: A Purchaser may (a) transfer his right, title and interest in and to his Trust Shares to another person, acceptable to the Sponsor and the Custodian, who has made application for the delivery of a similar Purchase Plan; (b) transfer his right, title and interest in and to his Trust Shares to another person who may only exercise the right of complete withdrawal; or (c) execute and file with the Custodian a declaration of trust, declaring that he holds his right, title and interest in and to his Trust Shares for the benefit of another person or persons."

It is clear, therefore, that regardless of the fact that The Pennsylvania Company, &c., is denominated in the Prospectus "a custodian", and regardless of the nature of the written agreement between The Pennsylvania Company, &c., and the Independence Shares Corporation (by virtue of which The Pennsylvania Company, &c., holds the title to the securities), nevertheless, The Pennsylvania Company, &c., holds the securities, not for itself, but as a trust; the trust is for the benefit of the subscribers or purchasers whose money bought those securities; and the subscribers or purchasers (the complainants as a class) are in consequence the cestuis que trustent.

While it is true that as a general rule unsecured simple contract creditors who have not obtained judgments upon their claims have not the status to appeal

to equity for relief, that situation does not exist here and the rule is not applicable. The complainants are beneficiaries of a trust. Regarded as such they have, in instituting proceedings in equity, appealed to ·the proper forum for redress of the alleged wrongs. See Case v. New Orleans & C. R. Co., 101 U.S. 688, 689, 690, 25 L.Ed. 1004:

"It is no doubt generally true that a creditor's bill to subject his debtor's interests in property to the payment of the debt must show that all remedy at law had been exhausted. And generally, it must be averred that judgment has been recovered for the debt; that execution has been issued, and that it has been returned nulla bona. The reason is that until such a showing is made, it does not appear, in most cases, that resort to a court of equity is necessary, or in other words, that the creditor is remediless at law. * * *

"But, after all, the judgment and fruitless execution are only evidence that his legal remedies have been exhausted, or that he is without remedy at law. They are not the only possible means of proof. The necessity of resort to a court of equity may be made otherwise to appear. Accordingly the rule, though general, is not without many exceptions. Neither law nor equity requires a meaningless form, 'Bona, sed impossibilia non cogit lex.' It has been decided that where it appears by the bill that the debtor is insolvent and that the issuing of an execution would be of no practical utility, the issue of an execution is not a necessary prerequisite to equitable interference. Turner v. Adams, 46 Mo. 95; Postlewait v. Howes, 3 Iowa 365; Ticonic Bank v. Harvey, 16 Iowa 141; Botsford v. Beers, 11 Conn. 369; Payne v. Sheldon, 63 Barb. (N.Y.) 169. This is certainly true where the creditor has a lien or a trust in his favor. * * *

"But, without pursuing this subject further, it may be said that whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal processes or remedies. Tappan v. Evans, 11 N.H. 311; Holt v. Bancroft, 30 Ala. 193."

To the same effect is Wyman v. Wallace, supra, where jurisdiction was taken of a creditor's bill in equity without judgments having first been obtained by the creditors. A fuller discussion of the law is afforded in the opinion of the Circuit Court in the same case, reported in George v. Wallace, 8 Cir., 135 ·F. 286, at page 292 et seq., accompanied by a citation of authorities. The Circuit Court said (page 292): "A suit for the enforcement of a lien or for the enforcement and administration of a ·trust is one peculiarly of equitable cognizance, and may be maintained by a contract creditor whose demand has not been reduced to judgment. Day v. Washburn, 24 How. 352, 16 L.Ed. 712; Case v. Beauregard, 101 U.S. 688, 25 L.Ed. 1004; Townsend v. Vanderwerker, 160 U.S. 171, 178, 16 S.Ct. 258, 40 L.Ed. 383; Clews v. Jamieson, 182 U.S. 461, 478, 21 S.Ct. 845, 45 L. Ed. 1183. In Oelrichs v. Spain, 82 U.S. 211 [15 Wall. 211], 21 L.Ed. 43, the court said that whenever an element of trust existed jurisdiction in equity was always conferred. In these respects the case at bar differs from those cited by the appellants. Jones v. Green, 68 U.S. 330 [1 Wall. 330], 17 L.Ed. 553; Smith v. [Ft. Scott, H. & W.] R. Co., 99 U.S. 398, 25 L.Ed. 437; Scott v. Neely, 140 U.S. 106, 11 S.Ct. 712, 35 L.Ed. 358; Nat. ·Tube Works Co. v. Ballou, 146 U.S. 517, 13 S.Ct. 165, 36 L.Ed. 1070; Hollins v. Brierfield Co., 150 U.S. 371, 14 S.Ct. 127, 37 L.Ed. 1113."

It is to be noted that in the above excerpt the Circuit Court specifically distinguished Hollins v. Brierfield Co., supra, relied upon by the defendants herein.

The same conclusions are reached in Merchants' National Bank et al. v. Chattanooga Construction Company, C.C., 53 F. 314, 317, where it was said: "It seems to me that this bill does not fall within any case in which it has been held that a judgment at law, or return of execution nulla bona, or both, is necessary to maintain the bill. It is not an effort to reach equitable assets merely. * * * In the case of Stutz v. Handley [C.C.], 41 F. [531], 537, * * the court says of that suit: 'Its object being to reach and subject a trust fund, complainants were not even required to have reduced their claims to judgment, and exhausted their remedy at law, after the insolvency of the company;' citing Case v. Beauregard, 101 U.S. 688–690 [25 L.Ed. 1004]. * * *"

The defendants cannot, therefore, prevail in their contention that the complainants have not the right to seek relief in a court of equity.

As for the prayer that a receiver be appointed: "the appointment of a receiver is merely an ancillary and incidental rem-

edy." Pusey & Jones v. Hanssen, 261 U.S. 491, 497, 43 S.Ct. 454, 456, 67 L.Ed. 763; Gordon v. Washington, 295 U.S. 30, 55 S. Ct. 584, 79 L.Ed. 1282; Burton v. Carey, 9 Cir., 82 F.2d 657.

In Cook v. Flagg, 2 Cir., 233 F. 426, the court, after stating that a trust existed because the defendant, having obtained money through fraudulent misrepresentations, had become a trustee ex maleficio, justified the appointment of a receiver by the court below on the ground that it was imperative to safeguard the corpus of the trust.

■ Passing now to the similar motion to dismiss on behalf of The Pennsylvania Co., &c., it is sufficient to say that this case differs entirely from that of Gordon v. Washington, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282. There, the Secretary of Banking had taken over a bank, and the Supreme Court held specifically that "the Secretary has the status of an equity receiver responsible to the court" in which he had filed a certificate of possession. True, there is no charge here that The Pennsylvania Company, &c., has been guilty of any misconduct, neglect or mismanagement and no testimony thereof. The Pennsylvania Company, &c., however, has *not* the status of an equity receiver responsible to any court. And, if the funds in its hands are to be preserved or distributed for creditors in the instant proceeding, that must be done by an arm of the court—a receiver appointed by the court and responsible to it.

■ A receiver will be appointed by the court to take possession of the subject matter of the trust or a part thereof, and to administer the trust in respect thereto, if this is necessary for the protection of the interests of the beneficiaries. This is one of the equitable remedies available to the beneficiary or beneficiaries of a trust. See Restatement of the Law on Trusts, Section 199, Chapter 7.

For the reasons stated, the defendants' separate motions to dismiss are refused.

As to the merits:

■ As previously stated, the testimony overwhelmingly substantiated the allegations in the bill of complaint that there were untrue statements made to purchasers in the sale of contract certificates, and that there was concealment of fact, of which untruths and concealments the purchasers were unaware.

Taken as a whole, the testimony and exhibits offered in evidence disclosed, in summary:

(1) That the Independence Shares Corporation, and its predecessor, the Capital Savings Plan, Inc., furnished salesmen with written instructions as to methods and material to be used by them in selling the contract certificates.

(2) That said written instructions contained and suggested the use of untrue statements of material facts and the omissions of vitally important relevant facts.

(3) That officers of the Independence Shares Corporation, and its predecessor, gave verbal instructions to salesmen which contained and suggested the use of untrue statements of material facts and the omissions of vitally important relevant facts.

(4) That the Independence Shares Corporation, and its predecessor, employed salesmen from every walk of life without necessary and proper qualifications, and solely because of the fact that they were in a position to sell fellow employees, relatives, friends, neighbors, and persons with whom they enjoyed business relations.

(5) That purchasers were told that the plan was a "savings" plan; that the plan was comparable to a savings bank account but paying a higher rate of interest.

(6) That purchasers were told The Pennsylvania Company, &c., was the "backer" of the contract certificates.

(7) That purchasers were told that The Pennsylvania Company, &c., "guaranteed" $2000 for every $1200 paid in over a ten-year period at the end of ten years.

(8) That purchasers were told $60 was the sole "service charge," when, in fact, $60 was the initial service charge, and there were other charges including a nine per cent overwriting collected by the Independence Shares Corporation, and its predecessor, on all shares placed in the investment portfolio of the plan purchaser (the nine per cent overwriting now reduced to seven and one-half per cent.).

(9) That purchasers were told The Pennsylvania Company, &c., was in sole and complete control of the "investment" of funds paid in by the contract plan purchasers.

(10) That there was misstatement and concealment of material facts relating to the life insurance features of the plan.

(11) That purchasers were told that money paid in could be withdrawn in full

at any time, or after definite periods variously represented to be one, two, or three years.

(12) That purchasers were told the trustee's agreement (the agreement between the Independence Shares Corporation and its predecessor, and The Pennsylvania Company, &c.) "guaranteed" $2000 for every $1200 paid in in ten years.

(13) That there was a concealment of charges made by the Independence Shares Corporation and its predecessor.

(14) That the Independence Shares Corporation maintained its own trading department to "make" a market for Independence Trust Shares, which were re-sold at a seven and one-half per cent mark-up to plan holders.

First as to the exhibits referred to. They included bulletins prepared by the Burton Bigelow Sales Coaching Clinic, at the request of the Capital Savings Plan, Inc. They contain instructions and suggestions to salesmen employed by Capital Savings Plan, Inc. These bulletins were of the familiar "high-pressure" sales type. Just a few examples:

"Bulletin No. 7—Every Earner is a Prospect! Don't Be Afraid to Cold Canvass.

"Bulletin No. 8—Making The Successful CSP Approach.

"Bulletin No. 9—Avoiding the 'Premature Exit' or 'Ease-Out' Before You Have Told Your Story.

"Bulletin No. 10—Separating the 'Suspects' from the Prospects.

"Bulletin No. 11—Emptying the Prospect's Bucket of Present Satisfaction.

"Bulletin No. 12—Using the Re-Hook Question.

"Bulletin No. 13—Re-Filling the Prospect's Bucket with Desire Points.

"Bulletin No. 14—Picturizing Future Life Money Needs.

"Bulletin No. 16—Eight Ways for Handling CSP Resistances.

"Bulletin No. 17—'The Words in Your Mouth—' Exactly What to Say When Handling the Most Frequently Met CSP Resisters.

"Bulletin No. 18—'The Words in Your Mouth—#2' Exactly What to Say When Handling the Most Frequently Met CSP Resisters."

The titles of these bulletins are eloquent evidence of the sales methods used by the defendant, Independence Shares Corporation, and its predecessor.

Plan holder after plan holder testified that the sales methods outlined in these bulletins were used on them to make sales.

Miss Agnes Landon, a plan holder, testified (page 192, notes of testimony): "A. He (the salesman) told me the Pennsylvania Company were trustees for this plan, that it positively could not go wrong because the Pennsylvania Company were backing them up in every way, shape and form."

The same witness also testified (page 190, notes of testimony): "A. I can't tell you everything he told me, because he talked very nearly an hour, but he did make it very clear to me that the Pennsylvania Company were the trustees for this affair. I was very much impressed by it being the Pennsylvania Company because at that time I had a trust fund there, which I still have, and that was the inducement of my taking these shares, because of the Pennsylvania Company * * *. He told me at the end of ten years after depositing $1200 with the Capital Savings Fund that I was to get $2000."

Again (page 192, notes of testimony):

"A. Oh, yes, I asked him if it was something similar to a building and loan. He said they were better than a building and loan because a building and loan sometimes doesn't run out for eleven or twelve years, but this positively would be paid back to me in ten years.

"By the Court:

"Q. What do you mean? A. The $2000 was to be paid to me in ten years."

Anthony Picone, a shoemaker, incidentally, who bought two plans, testified (page 199, notes of testimony):

"A. Yes, he told me the Pennsylvania Company was in back of it.

"Q. Did you know who they were, the Pennsylvania Company? A. Well, I heard about it, it was a bank of great reputation."

Mrs. Grace Picone, whose husband was a plan holder, testified (page 202, notes of testimony): "A. He (the salesman) said the Pennsylvania Company was in back of it * * *."

Miss Jean Fitch, a plan holder, testified that a co-employee in a local department store was also a salesman for the defendant, Independence Shares Corporation, and stated further (page 219, notes of testi-

mony): "A. The salesman told me that the Pennsylvania Company was in charge of the money and they were backing the money up."

Miss Laura Burdette, a saleswoman for the Capital Savings Plan, Inc., testified (page 228, notes of testimony) that she was employed: "A. To go out and sell it to other people, anybody that wanted to buy it."

Miss Burdette stated that she was coached by a Mrs. Jane T. Balanos, a general agent of Capital Savings Plan, Inc. Her testimony (page 231, notes of testimony) is illuminating:

"Q. What did she (Mrs. Balanos) tell you about the plan, and what to tell the customers? A. She told me to go out and tell the customers that this Capital Savings Plan was a very good investment, it was better than a bank, it was better than a building and loan, it was better than anything on the earth, and it had forty-two of the best companies in the country that were backing it up. The Pennsylvania Company was supposed—was one of the companies, one of the banks that was backing it up, very, very much. I was supposed to emphasize that above everything else.

"By the Court:

"Q. You say, 'supposed to emphasize;' were you told to emphasize it? A. I was.

"Q. That the Pennsylvania Company was one of the backers? A. Yes * *."

Miss Burdette also testified that Frank C. McCown, vice-president of the defendant, Independence Shares Corporation, and its predecessor, was present at the conversation with Mrs. Balanos, when she received sales instructions (page 233, notes of testimony).

In connection with this incident, Miss Burdette testified that McCown told her not to say that the plan would run out in ten years, but that (page 234, notes of testimony):

"A. Mr. McCown said, 'You don't sell it that way. Tell the people in seven and a half years they are going to get $2000.'

"By the Court:

"Q. In seven and a half years on a $10 payment per month? A. That's right, but that was supposed to mature in seven and a half years.

"Q. Did you have any literature in connection with this? A. When I went to sell the people?

"Q. Yes, with this seven and a half year proposition. A. Yes, I did.

"Q. I show you Exhibit C–3. A. That is correct."

Incidentally, Miss Burdette, at the time she was employed as a saleswoman, was but 18 years old. She testified that among others whom she sold was a produce peddler.

Another witness, Cosme Balanos, testified (page 275, notes of testimony) that he was employed as a salesman by Capital Savings Plan, Inc.; that the company supplied him with a "sales kit", on the first page of which was a photograph of the doors of The Pennsylvania Company, &c.; that on the inside was a financial statement of The Pennsylvania Company, &c.; that next appeared a letter from a vice-president of The Pennsylvania Company, &c.

The following excerpts from the sales bulletins supplied by the defendant, Independence Shares Corporation, and its predecessor, to salesmen disclose that the misstatements and the concealment of facts which the complainants allege abounded in these bulletins.

For example:

Bulletin No. 13, "Re-Filling The Prospect's Bucket With Desire Points," referring to the payments made by the plan holders, states (page 4): "This is *legally safeguarded* by an *old, reliable trustee* and by them proportionately invested in trust shares * * *."

Bulletin No. 16, "Eight Ways for Handling CSP Resistances," states (page 2): "The *Trustee guarantees* that if you carry your contract to maturity, you will never pay in more than $1200, and that you will never receive less than $2000 as its matured value."

Bulletin No. 17, " 'The Words in Your Mouth—' Exactly What to Say When Handling the Most Frequently Met CSP Resisters," states (page 8):

"*The trust agreement with the Trustee, The Pennsylvania Company guarantees* that if you carry your contract to completion and get all its benefits, you cannot possibly invest more than $1200 for each $2000 maturity.

"*The Trustee's agreement likewise guarantees you* that you will never get less than $2000 upon the maturity of your Plan."

Bulletin No. 18, " 'The Words in Your Mouth—#2' Exactly What to Say When

774

Handling the Most Frequently Met CSP Resisters," states (page 10):

"The Trustee also collects your dividends, *reinvests* them for you and carries out the provisions of your *savings program.*

"Yet, when you pay the sales person who sold you, the trustee, the operators of CSP—everybody— *it costs you only $60 for each $2000 maturity."*

Bulletin No, 19, "Making the Successful Close," states (page 4):

"There is nothing new about the CSP principle—except the fact that the small man is allowed to get in on it. The Trustee Bank is 125 years old, the average age of the forty-two corporations is 55 years, and the Plan itself is the fastest-growing *Savings Plan* in the country.

"No need to take my word for anything about this Plan. The forty-two corporations are well-known and their assets and earnings are published regularly. The Trustee is a 125-year old bank with assets of a quarter of a billion dollars. You can look these things up for yourself any time."

The various Prospectuses also contained misstatements of fact.

For example:

The Prospectus of November 1, 1933 (Exhibit C-1), states on page 5, under the caption "Your Trustee," the following:

"The Pennsylvania Company for Insurances on Lives and Granting Annuities, founded in 1812, is one of the oldest banks in the United States. Its Trust Department is one of the largest in the country.

"The collecting, *investing* and protecting of your money is entrusted not to Capital Savings Plan, Inc., but to your Trustee.

"If Capital Savings Plan, Inc., and the Trustee went out of existence, your property would be unaffected, for legally it is yours, definitely put aside in trust for you. These funds *cannot be removed* from the safekeeping of the Trustee except by your order, as long as your payments are maintained."

See also the Prospectus (Exhibit C-3) from which the witness Cosme Balanos testified he made sales in 1934. This Prospectus, also under the caption "Your Trustee," states: "The investing of your money is entrusted not to Capital Savings Plan, Inc., but to your Trustee, The Pennsylvania Company for Insurances on Lives and Granting Annuities, Philadelphia."

From the same Prospectus: "Your ownership in the common stocks of these companies is made possible through the purchase by the Trustee of Independence Trust Shares, also trusteed and *operated* by the same Trustee."

From the same Prospectus, under the caption "Your Own Trust Fund": "The $10 a month which you set aside (you may save more if you care to) is *invested* and *looked after* by one of the country's oldest and most trusted financial institutions, which, as Trustee, receives your money, *invests* it, and receives and *reinvests* all your profits for you."

This Prospectus also states, under the caption "The Service Fee": "The total service fee to Capital Savings Plan, Inc. is $60 for each $2000 maturity value contract ($10 per month) applied for. This is payable out of deductions made during the first year's payments. The Trustee charges $3 per year—25 cents per month—for each year the contract is in force, up to and including the first ten years."

The application for contract certificates of the Capital Savings Plan, Inc. (Exhibit C-9), also states that $60 is the maximum service fee, with the only other charge being 25 cents monthly to the trustee.

The Prospectuses time and again aim to sell the "fact" that the plan holder, by subscribing, is entering upon a "savings" program. The very designation "Capital Savings Plan" speaks for itself.

The book given to subscribers, so that entries might be made of their payments, is in the pattern of a bank deposit book (Exhibit 13).

The testimony of these witnesses, and the bulletins and prospectuses quoted from, give the entire complexion of the methods of salesmanship, the "guarantees" given to plan purchasers, the positive misrepresentations, and the failure to disclose material facts. For example, the statements in Bulletin No. 2 that *"These funds cannot be removed from the safe keeping of the trustee except upon your order,"* and "This is *legally safeguarded* by an old, reliable trustee and *by them* proportionately invested in trust shares * * *" are absolute misrepresentations.

In this connection the record discloses:

(1) That The Pennsylvania Company, &c., was a trustee with limited powers (page 57, notes of testimony).

(2) That management of the Trust Shares and the stock which comprised the Trust Shares is *solely* in the Independence Shares Corporation, and *not in the control* of The Pennsylvania Company, &c.

(3) That the Independence Shares Corporation *in its discretion* can sell any of the underlying forty-two securities and *reinvest* the proceeds in shares of the remaining underlying companies.

(4) That The Pennsylvania Company, &c., *does not* select the investments.

(5) That The Pennsylvania Company, &c., *does not "guarantee"* the safety of the investments, the maturity of the plans, or that the plan holders will receive $2000 in 10 years or at any other time—in fact, the only duty of The Pennsylvania Company, &c., is the safekeeping or custody of the Trust Shares.

(6) That the statement made in Bulletin No. 18, and by salesmen, "When you pay the sales person who sold you, the trustee, the operators of CSP—everybody—*it costs you only $60* for each $2000 maturity," is untrue. In addition to the $60 charge, there was a nine per cent (now reduced to seven and one-half per cent) "overwriting" or "load" charge made by the defendant, Independence Shares Corporation, and its predecessor, on the Trust Shares which went into the plan holder's portfolio. In other words, the subscribing plan holder paid his $60 service charge, and each dollar he paid in was subjected to the nine per cent (now seven and one-half per cent) overwriting profit made by the sponsor company, Independence Shares Corporation, and its predecessor. In addition, when, as it recently happened, seven of the forty-two underlying securities were sold and the proceeds reinvested in some of the thirty-five remaining underlying securities, there was an additional charge of seven and one-half per cent made with respect to that reinvestment. Also, Independence Trust Shares were subject to an additional charge of two and one-half per cent of currently distributable income and currently distributable principal.

There is also undisputed evidence to the effect that there was misrepresentation as to the cost of life insurance, which was featured as an adjunct of the plan. This misrepresentation, and in some instances concealment, had two aspects:

(1) That plan holders were led to believe that the insurance premium was paid by Independence Shares Corporation.

(2) That, upon the death of the insured, the full $2000 maturity would be paid over to the plan holder beneficiary—when, as a matter of fact, the insurance was for the unpaid balance of installments due by the insured plan holder.

Reference was made to the recent sale of seven of the forty-two securities constituting the portfolio of Independence Trust Shares. The testimony disclosed that in February, 1939, upon advice of its investment counsel and upon the adoption of appropriate resolutions by the board of directors, the Independence Shares Corporation sold seven of the securities in its portfolio. The proceeds of the sale totaled $662,335.76.

The "values" of these seven securities at the dates they were deposited with the trustee, as determined by Independence Shares Corporation, was $763,655.33.

The $763,655.33 was the cost of the securities to the Independence Shares Corporation. The cost to the plan holders was approximately $820,000, since there was a seven and one-half per cent "overwriting" or "load" which the Independence Shares Corporation charged the plan holders (see page 582, notes of testimony).

Consequently, as a result of the sale of these seven securities for $662,335.76, there was a loss to the plan holders of $158,000.

There was still a further loss to the plan holders in this transaction. Independence Shares Corporation, in reinvesting approximately $550,000 of the $662,000 received in the sale (the balance was disbursed in cash to plan holders), charged an "overwriting" or "load" of seven and one-half per cent against this $550,000, or approximately $40,000 (see page 321, notes of testimony).

The net result of the "overwriting" at the time of the original investment; the loss in the sale of the securities, and the second seven and one-half per cent "overwriting" charge, was a loss to the plan holders of close to $200,000—or approximately twenty-five per cent of the amount they paid in.

In discussing this transaction, no criticism is intended of the sale of these seven securities since there was no evidence that there was an abuse of discretion on the part of investment counsel or of the Independence Shares Corporation. With respect to The Pennsylvania Company, &c., under the terms of the trust agreement with the Independence Shares Corporation,

it had no say or part in the sale of the seven securities.

The transaction is cited for two reasons:

(1) As evidencing the fact that the Independence Shares Corporation had, and exercised, *sole control* of the securities in the trust, and that The Pennsylvania Company, &c., had *no control* or authority whatsoever over the securities; .

(2) That there were overwriting charges made against, and losses suffered by, the plan holders by the exercise of control and authority lodged in the Independence Shares Corporation, which was not only concealed from the plan holders, but which was deliberately misrepresented to the plan holders. (See Bulletin No. 18, page 10:. "It costs you only $60 for each $2000 maturity"; Bulletin No. 2: "These funds cannot be removed from the safekeeping of the trustee except upon your order"; in the same Bulletin: "This is legally safeguarded by an old, reliable trustee and *by them* proportionately *invested* in trust shares.")

This loss of approximately $200,000 has another important significance.

According to its latest available financial statement, the Independence Shares Corporation as of February 28, 1939, had total assets of $84,364. Of the latter amount, $37,759 was carried as "good will." Deducting the $37,759 "good will" item, the actual assets of Independence Shares Corporation are approximately $47,000.

As against the approximately $47,000 of assets, there existed a contingent liability as of August 31, 1938, of $3,486,000 with respect to 1,104,869 Independence Trust Shares sold by the Independence Shares Corporation or its predecessor during the period from September 1, 1935, to June 14, 1938. This $3,486,000 represents actual receipts by the Independence Shares Corporation or its predecessor from the sale of such Shares.

 Final determination that plan holders are entitled to the amount which they have paid in, plus interest, by reason of the fact that there was fraud in the sales made to them, raises the question as to whether it will be possible for the Independence Shares Corporation to satisfy awards made to the plan holders.

As has been stated, there has already been a $200,000 loss to the plan holders.

 The complaint asserts that the Independence Shares Corporation is insolvent. At the very outset of these proceedings the attorneys were advised that in the event the motions to dismiss were denied, and that in the further event that this court was of the opinion that the prayer for the appointment of a receiver should receive further consideration, then the question of solvency or insolvency of the Independence Shares Corporation would be referred to a special master for his investigation and report.

The motions to dismiss having been denied, and the court being of the opinion that there should be further consideration of the prayer for the appointment of a receiver, this matter will be specially referred to John M. Hill, Esquire, as Special Master, to take testimony as to the solvency or insolvency of the Independence Shares Corporation and to make his report to the court at the earliest possible date.

The report of the special master as to the solvency or insolvency of the Independence Shares Corporation will be of material assistance in the final determination of the prayer for the appointment of a receiver.

Further disposition in this proceeding will await the Special Master's report.

All motions to dismiss this action are denied, and the above-entitled matter is referred to John M. Hill, Esquire, as Special Master, and the Special Master is hereby ordered, directed and authorized to hear and determine an issue raised in this case, to wit, the question of the solvency or insolvency of the defendant, Independence Shares Corporation (a Pennsylvania corporation), and to that end to take and hear testimony bearing upon that issue, the said testimony to be taken by a Court Stenographer, transcribed and submitted to this Court, together with the report of the Special Master. The said report of the Special Master shall be submitted as expeditiously and promptly as may be possible, and shall contain the Special Master's findings of fact and law upon the question of the solvency or insolvency of the said defendant, together with whatever discussion of law the Master deems proper and necessary. Jurisdiction of this entire case is meanwhile retained by this Court.