## Null's Estate.

.

Argued September 29, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Albert H. Bell,* for appellant.

*James Gregg,* with him *Curtis H. Gregg,* for appellees.

OPINION BY MR. JUSTICE KEPHART, November 24, 1930:

Claimant presented for allowance in the court below two notes aggregating the sum of $6,500 against the estate of his mother, Christena Null. The notes were disallowed because claimant failed to prove that his mother acted voluntarily, deliberately, and that she knew what she was doing; on the contrary, it was found that the mother was incompetent and that there was a confidential relation.

The presumption as to gifts, inter vivos, is that the donor has mental capacity. This presumption can be rebutted. Capacity relates to soundness of mind, or in other words a mind that has full and intelligent knowledge of an act engaged in, an intelligent perception and understanding of the dispositions made of property, and the persons and objects one desires shall be the recipi-

ents of one's bounty: Lawrence's Est., 286 Pa. 58, 65. Old age, sickness, distress or debility of body do not prove or raise a presumption of incapacity (Wilson v. Mitchell, 101 Pa. 495), nor do inability to transact business, physical weakness, peculiar beliefs and opinions, or failure of memory: Lawrence's Est., supra, and authorities there cited. Want of mental capacity affects all transactions, and while, generally speaking, it requires more business judgment to make a gift than to make a will, as the former is immediately active while the latter is prospective, still incapacity as a fact must appear before the gift can be set aside.

Decedent, though eighty-seven years of age when the gift was made, was in possession of unusual mental as well as physical vigor. She died a little less than ten years thereafter, and, until death, possessed in a slightly modified degree that same vigor. She was described as then being alert and above the average intelligence. The two ladies who testified on this subject reduced their testimony to this conclusion; they thought she would not do a thing of this kind, i. e., give the two notes in question; they believed she was not as strong mentally at eighty-five as she was at seventy-five. These witnesses saw her only once a year during twenty-five years; possibly one of them saw her a little oftener, perhaps twice or three times a year; and testimony that she did not take much interest in business affairs must be limited by the fact that no business subject was called to her attention by them, though she read books and the Bible which was discussed with intelligence. This is practically the substance of all the testimony on this question; it is inadequate. So we may here dismiss the complaint as to incapacity of deceased as it related to the gift.

Actual undue influence must be distinguished from confidential relations, as such. Where there is no coercion amounting to duress, but the transaction is the result of a moral, social, or domestic force, consciously

and designedly exerted on a party peculiarly susceptible to external pressure, on account of mental weakness, old age, ignorance and so forth, controlling the free action of the will and preventing a true consent, equity may relieve against the transaction on the ground of undue influence. The existence of fiduciary relation is unnecessary and immaterial: Pomeroy's Equity Jurisprudence, volume 2, section 955.

Confidential relation is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; in both an unfair advantage is possible. Where one is bound to act for the benefit of another, he can take no advantage to himself. No precise language can define the limits of the relation; it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In such cases, the confidential relation is a conclusion of law, in others, as parent and child, it is a question of fact to be established by the evidence: Harrison v. Welsh, 295 Pa. 501, 506; Leedom v. Palmer, 274 Pa. 22, 25; Pomeroy's Equity Jurisprudence, volume 2, sections 956, 957, 962. Mental weakness, old age, ignorance and so forth, is not assumed as an element, nor is undue influence a necessary part except so far as the ability to exercise undue influence is implied in the very conception of a confidence: Pomeroy's Equity Jurisprudence, volume 2, section 955. The mere existence of kinship does not, of itself, give rise to confidential relation: Clark v. Clark, 174 Pa. 309, 336.

When a confidential relation is established, the presumption is that the transaction, if of sufficient importance, is void and there is cast on the donee the burden of proving affirmatively a compliance with equitable requisites and thereby overcoming the presumption; he must affirmatively show that no deception was used and

the act was the intelligent and understood act of the grantor, fair, conscientious and beyond the reach of suspicion; but the fact that a child receives a gift from a parent does not of itself impose the burden of proof on the child to furnish testimony to assert its validity: Clark v. Clark, supra; Thorndell v. Munn, 298 Pa. 1.

Where the parent is aged, infirm, or otherwise in a condition of dependence on a child, and the child occupies a corresponding relation of authority, conveyances conferring benefits upon the child may be set aside, but cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity: Pomeroy's Equity Jurisprudence, volume 2, section 962.

Where undue influence and incompetency do not appear, and the relation between the parties is not one ordinarily known as confidential in law, the evidence to sustain such relation must be certain; it cannot arise from suspicion or from infrequent or unrelated acts; care must be used not to confound acts springing from natural love and affection with confidential relations, and, while the line of demarcation may in some cases be narrow, nevertheless, to sustain the integrity of gifts based on such affection in family relations, it is necessary that the distinction should exist: Harrison v. Welsh, supra; Leedom v. Palmer, supra, 26. Dependency does not necessarily beget a confidential relation; indeed, it may be quite the reverse.

To establish a confidential relation it should appear that a confidence or trust was reposed in the child, occupying a position of supervision, authority and general direction over the parent's business affairs, and, unless such a relation is established, the burden of proof to establish the essentials of a valid gift as defined is not shifted to the child.

With the cautionary advice set forth in Thorndell v. Munn, 298 Pa. 1, 10, where an attempt was made to set aside a transfer by an elderly donor, that, "while a court

of equity should, in proper cases, unhesitatingly set aside gifts between persons situated like decedent and defendant, 'the power to do so is of an exceedingly delicate character, not to be lightly exercised, and only to be invoked when the manifest justice of the case requires it" (Lawrence v. King, 299 Pa. 568, 577, and Bauman v. Reithel, 302 Pa. 239), we will pass to the question involved.

We search in vain through this record to find adequate evidence to lay a foundation for either undue influence or confidential relation. As stated, the donor was mentally vigorous and physically strong when she made the gift. She was not sought after by her son, but went to see him for the special purpose of giving these notes, as will afterwards be discussed. The story may be told in this manner: The claimant had been living away from his parents. Evidently they had reached a stage when some person other than themselves should run the farm. Other children of decedent had declined to take it over and the father and mother asked this son and his wife to come onto the property. An agreement in writing was made whereby the parents consented to sell to this son a certain part of the land at forty-five dollars an acre, with further provision that support would be furnished the father and mother during the remainder of their lives. There is no evidence that the land was worth more than forty-five dollars an acre. The son moved onto the farm, erected a house at a cost of $4,500 a short distance from the homestead, where he lived; other valuable improvements on the property were made by him.

There is no contention that the contract was not faithfully complied with; the court found that it had been when it decreed a conveyance of the land after the mother's death. The charge is made that claimant transacted her business and from it a confidential relation is asserted. The evidence shows she wanted this son to transact her business but the other children objected.

Furthermore, there was very little business to transact. There was evidence that he received the proceeds of the sale for a few hundred dollars of some timber and gas from the property, but there can be no criticism of this act; he had a contract to buy; it was a part of the land; and as equitable owner he was entitled to the proceeds of the sales. It served as an election to take under the contract. Some stress is placed on his acts under the agreement with the mother to mine coal which was reserved from the sale of the land to the son. He began by paying her a royalty of half a cent a bushel. The operation was expensive, and, in addition to the cost of mining, it had to be hauled to a railroad and loaded on the cars; only a few cars were shipped. The other children complained that their mother was not getting enough royalty. The amount was raised, first to one cent, then one and a half; and, when the children demanded two cents, claimant said he would lose money, and discontinued mining, clearing out his equipment. He was in the dairy business and purchased milk from his mother, but paid her regularly for it, as was shown by receipts. These are all the business relations that existed between the parties. Whether there is sufficient evidence to sustain a confidential relation is generally for the court, and, if there is, though contradicted, the finding thereon by the court will not be disturbed on appeal. There was not sufficient evidence for the court to find a confidential relation in this case.

Decedent had the fullest confidence in a daughter who lived with her and looked after the household affairs. Evidently the other children became dissatisfied with their expectancy and complained to their mother. This is the inference from the mother's expression when she told this son that the other children were trying to beat him out of his share of the estate. This was at the time she called at claimant's house. We cannot surmise what might have been in her mind, as the deed for the surface had not been executed, it might have been his interest

in the land and the house he had built on it. However, she then asked for, executed and delivered the notes in question. The mother must have been actuated by what the other children were trying to do. But as the gift was executed, the evidence was not sufficient to call on him for an explanation because of incompetency, undue influence or confidential relation. It follows that the judgment of the court below in refusing to allow the notes was erroneous.

The decree of the court below is reversed, the record to be returned to the court below for proceedings in accordance with this opinion. Costs to be paid by the estate.