DECKERT et al. v. INDEPENDENCE SHARES CORPORATION et al.

Civ. A. No. 218.

District Court, E. D. Pennsylvania.
June 17, 1941.

Harry Shapiro, of Philadelphia, Pa., for plaintiffs.

Harry A. Kalish (of Murdoch, Paxson, Kalish & Green), of Philadelphia, Pa., for defendant Independence Shares Corp.

Francis H. Bohlen, Jr. (of Saul, Ewing, Remick & Saul), of Philadelphia, Pa., for defendant Pennsylvania Co.

KALODNER, District Judge.

To preserve the estate pending final decree, plaintiffs [1] in this case have moved to enjoin the Pennsylvania Company for Insurances on Lives and Granting Annuities from making any deductions (other than deductions for insurance premiums and taxes) from payments received by it in its capacity as trustee under the trust agreement with Capital Savings Plan, Inc., and in its capacity as custodian for Independence Trust Shares Purchase Plans, from the holders of Capital Savings Plan Contract Certificates or the holders of Independence Trust Shares Purchase Plans, or from any distributions received upon Independence Trust Shares, and from apply-

---

[1] Summary of proceedings as stated in 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. —:

Plaintiffs are owners and holders of Capital Savings Plan Contract Certificates purchased from Capital Savings Plan, Inc., since merged with and now Independence Shares Corporation, a Pennsylvania corporation. These certificates required the holders to make certain installment payments to the Pennsylvania Company for Insurances on Lives and Granting Annuities, also a Pennsylvania corporation. Pennsylvania, after deducting certain fixed charges, used the balance of these installment payments to purchase Independence Trust Shares for the benefit of the certificate holders. Independence Trust Shares, issued by Pennsylvania, represented interests in a trust of common stocks of 42 American corporations deposited by Independence with Pennsylvania. Pursuant to trust agreement and indenture between Pennsylvania and Independence, Pennsylvania collected dividends and profits from the stocks and administered the trust.

Plaintiffs brought suit against Pennsylvania, Independence, two affiliated companies, and certain officers and directors of Independence whose residence does not appear. The action against the affiliated companies was dismissed.

The bill alleges that Independence and its predecessor Capital were guilty of fraudulent misrepresentations and concealments in their sale and advertisement of contract certificates to petitioners and others similarly situated in violation of the Securities Act of 1933. It alleges that Independence is insolvent and threatened with many law suits, that its business is virtually at a standstill because of unfavorable publicity, that preferences to creditors are probable, and that its assets are in danger of dissipation and depletion. Plaintiffs therefore pray the appointment of a receiver for Independence with power to collect and take possession of the assets of Independence and the trust assets held by Pennsylvania, liquidate the assets, determine the claims of plaintiffs and other certificate holders and pay them, and wind up and dissolve the corporations. They also seek relief incidental to the above and an injunction restraining Pennsylvania from transferring or disposing of any of the assets of the corporations or of the trust. There is the usual prayer for general relief.

ing said payments or distributions to the purchase of Independence Trust Shares from the Independence Shares Corporation.

The plaintiffs' motion for injunction further seeks to restrain the Pennsylvania Company for Insurances on Lives and Granting Annuities (hereinafter referred to as Pennsylvania) from dealing in Independence Trust Shares, or from paying over the proceeds of the sale, redemption or liquidation of any Independence Trust Shares to the holders thereof, leaving Pennsylvania free to sell, redeem or liquidate any Trust Shares at the direction of any holder thereof.

Additionally, the injunction sought provides that Pennsylvania shall segregate and set aside in a special account until further order of this Court all payments by plan holders, distributions and proceeds of sale, liquidation or redemption, excepting only deductions for insurance premiums and taxes previously mentioned.

Finally, the prayed for injunction specifically provides that it shall not affect any Independence Trust Shares other than those held by Pennsylvania as trustee under the trust agreement with Capital Savings Plan, Inc., and those held by Bean & Company, nominee of Pennsylvania as custodian for Independence Trust Shares Purchase Plans.

It is agreed by the parties that the injunction asked for poses these important questions: (1) The nature of the action; (2) the extent of relief permissible under the action; (3) the nature or position of the assets held by Pennsylvania as trustee under the trust agreement with Capital Savings Plan, Inc., and in its capacity as custodian under Independence Trust Shares Purchase Plans.

Disposition of these questions is essentially involved in the ultimate determination of the prayers in the complaint, to wit, appointment of a receiver for the defendant Independence Shares Corporation, with power to collect and take possession of the assets of Independence, and the trust assets held by Pennsylvania, to liquidate the assets, determine the claims of complainants and other certificate holders, and distribute the same among the persons entitled thereto.

Earlier in this proceeding (27 F.Supp. 763) I referred to a special master the question of solvency of Independence, having in the meanwhile enjoined Pennsyl-

vania from transferring or disposing of the sum of $38,258.85 representing certain charges, income and proceeds received by Pennsylvania.

An appeal to the United States Circuit Court of Appeals for the Third Circuit interrupted the proceedings on the solvency question. That appeal was based on my denial of motions to dismiss on the ground that this Court lacked jurisdiction and the granting of the temporary injunction with respect to the $38,258.85 previously mentioned.

The Circuit Court of Appeals (3 Cir., 108 F.2d 51) reversed all of the orders appealed from, and remanded the cause with directions to allow the complainants to amend their complaint and state a claim for a money judgment at law against Independence only.

The Supreme Court of the United States (311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189) reversed the decision of the Circuit Court of Appeals, ruling that the complaint stated a cause for equitable relief under Sections 12(2) and 22(a), 15 U.S.C.A. §§ 77$l$ (2) and 77v.(a) of the Securities Act of 1933 (48 Stat. 84 and 86) and remanded the cause for further proceedings.

Subsequent to the Supreme Court's ruling (December 9, 1940) the special master resumed hearings on December 20, 1940 on the question of solvency of Independence. He filed his report on January 13, 1941, with the finding that Independence was insolvent at the time of institution of the instant action and is presently insolvent.

Independence and Pennsylvania thereupon filed exceptions to the special master's report. At the request of the parties the court held further hearings in January and February, 1941, and during the course of these further hearings the parties and additional plan holders laid down a barrage of motions to intervene, to amend, to strike, and to dismiss. All motions to intervene on the part of plan holders, other than those represented by counsel for the original complainants, were granted. A motion by counsel for the complainants to amend the original complaint by adding 38 additional complainants was also granted. Objection was made by both Independence and Pennsylvania to the amendment adding the additional complainants on the ground that they were barred by the statute of limitations, the objection involving question No. 1—the nature of the proceeding—which will be discussed subse-

quently. At the conclusion of the taking of testimony the complainants made the motion for the injunction mentioned at the beginning of this opinion.

In recognition of the fact that adjudication of the problems posed by the objections to the special Master's report finding insolvency and the motion to amend the complaint, as well as other pending motions to strike evidence and to dismiss the complaint, would consume considerable time, the complainants and the respondents have agreed upon the desirability of determination of the questions raised by the motion for the injunction.

Now, as to the questions raised by the motion for the injunction:

### (1) The nature of the complainants' action

■ Defendants Independence and Pennsylvania strenuously contend that this is a "spurious" class bill, while the complainants contend that it is what is generally called a "hybrid" class action. The question as to whether this is a "spurious" class bill or a "hybrid" class bill according to the contending parties involves (1) the extent of relief which may be granted, and (2) the joining of additional complainants. Respondents contend that this is a "spurious" class bill and that under the statute of limitations in Section 13 of the Securities Act of 1933 (48 Stat. 74, 84, 15 U.S.C. A. § 77m additional parties cannot now be joined as complainants; complainants contend that it is a "hybrid" class action and that the statute of limitations does not apply.

The dispute between the parties as to the nature of the bill is predicated to some extent upon the course of this litigation. In my opinion (27 F.Supp. 763, 769) I specifically ruled that "this is a class bill". The Circuit Court of Appeals, on appeal (108 F.2d 51, 55), ruled "The suit at bar is of the type denominated a 'spurious' class suit * * *." The Supreme Court's opinion (311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189) failed to append any descriptive label to the action.

The Circuit Court of Appeals' denomination of the bill as a "spurious" class suit must be considered in connection with its ruling that the action was one at law and not in equity, and that the complainants were merely seeking individual redress although acting as a "group" under the permissive joinder facilities of Rule 23(a) (3) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

In my judgment this is a "hybrid" class bill, maintainable under Rule 23(a) (2) of the Federal Rules of Civil Procedure, which reads as follows:

"Rule 23. *Class Actions*

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

&ast; &ast; &ast; &ast; &ast; &ast;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action."

In the present action the claims of the various claimants are several in nature. The action can be viewed as akin to the ordinary creditor's bill for the appointment of a receiver, an accounting, and distribution of the assets of the insolvent debtor. Although there is a mutuality of interests in the questions involved, the rights of the claimants are several and not joint; in addition, there is present a fund to be managed and distributed.

The ruling of the Supreme Court that the instant action may be maintained under the Securities Act of 1933 is of the utmost significance in this connection. The following quotation from the Supreme Court's opinion, 311 U.S. 282, at page 290, 61 S.Ct. 229, at page 234, 85 L.Ed. 189, is highly illuminating: "As already stated, there were allegations that Independence was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against Independence, without recourse to the fund in the hands of Pennsylvania, would be inadequate."

Professor Moore's discussion of "The Hybrid Class Action" in 2 Moore's Federal Practice, pages 2239, 2240, sustains my conclusion. Describing "The Hybrid Class Action" Professor Moore said, in part: "This action is unique, but its importance is decreasing. Though the class has a mutuality of interests in the question involved, still the rights of the members of the class are neither joint nor common; they are several. In addition to the question of fact common to all, there is, in lieu

of joint or common interests, the presence of property which calls for distribution or management. This type of action is exemplified by a creditor's bill for the appointment of a receiver * * *."

As to the contention of Independence and Pennsylvania that the statute of limitations in Section 13 of the Securities Act of 1933 barred additional plaintiffs:

The authorities disclosed a marked absence of any discussion of the problem of the application of the statute of limitations in "hybrid" class suits. However, in creditors' suits for the appointment of a receiver—most typical of the "hybrid" class actions—there appears to be a line of cases holding that where the suit is instituted for the benefit of all interested parties, and where interested parties later seek to intervene, that the statute of limitations is applied up to the time of the institution of the suit and not up to the time of the intervention. The underlying theory of the decisions in the cases cited is apparently that the creditors, absent or represented, each have an inchoate interest in the suit from the filing of the original bill.

As was stated in Richmond v. Irons, 121 U.S. 27, 54, 7 S.Ct. 788, 800, 30 L.Ed. 864: "In Sterndale v. Hankinson, 1 Sim. 393, decided in 1827, it was stated by Vice-chancellor Leach that 'every creditor has to a certain extent an inchoate interest in a suit instituted by one on behalf of himself and the rest, and it would be attended with mischievous consequences to estates of deceased debtors if the court were to lay down a rule by which every creditor would be obliged either to file his bill or bring his action.'"

See, also, Marsh v. United States, 4 Cir., 97 F.2d 327, 330: "* * * Where, therefore, a claim is denied and suit is instituted thereon, such suit is in reality for the benefit of all persons interested under the policy, provided they come in and make themselves parties; and in such situation the statute of limitations should apply not to the time of intervention, as in the case of the assertion of an independent claim, but to the time of the institution of suit which has been brought to enforce the liability in which all are interested. This is the rule generally applied in creditors' suits. 15 C.J. 1409; Richmond v. Irons, 121 U.S. 27, 51, 52, 7 S.Ct. 788, 30 L.Ed. 864; Dobson v. Simonton, 93 N.C. 268; Laidley v. Kline's Adm'r, 23 W.Va. 565; Taber v. Royal Ins. Co., 124 Ala.

681, 26 So. 252; Dunne v. Portland St. R. Co., 40 Or. 295, 65 P. 1052. And it is not unreasonable to apply it to suits such as this, where the establishment of liability under the policy is the matter in which all the beneficiaries are interested and where all are given the right to intervene. *The institution of suit by one beneficiary is potentially for the benefit of all just as in the case of the filing of a creditors' bill.* * * *." (Emphasis supplied.)

The following language from Dobson v. Simonton, 93 N.C. 268, at pages 271, 272—cited in the above-quoted excerpt from Marsh v. United States, supra—is pertinent: "While the creditor having the right to share in the fund, but not designated in the action by his name, is not in the beginning of it completely a party to it, he is a party in an important sense. The action is brought for him, and with a view to render it unnecessary, indeed improper, that he should sue in a separate action; it is for the assertion and enforcement of his right, if he chooses to take the benefit of it. It may be said, that he does not bring it; and so he does not by himself,—but in such case, the law allows another to bring it for him. It may be said that he might bring a separate action for himself; but if he should, he would do so at the peril of being interrupted in its prosecution by an injunction, and compelled to seek relief in the creditor's action. From the beginning of the action, such creditor has an inchoate interest in it; by it he demands the payment of his debt and begins to seek legal redress in that respect, and he thus stops the running of the statute of limitation against it, and all controversy as to his debt, however it may arise in the course of the action, so far as the same may be affected by the beginning of legal proceedings on his part, must have relation to the beginning of the action. It would be a strange anomaly in the law, if it should thus allow an action to be brought for a party, and he should be thus encouraged to rely upon it, and not seek legal redress otherwise than by it, and yet when he came, in the course of the action, to prove his debt, and share in the fund, to treat him as having, by such reliance, lost it by the lapse of time, happening after the beginning of the action! * * * The rule that the bringing of the action prevents the running of the statute of limitation as to the debt of each creditor, whether designated in the original process or the com-

plaint, by name or not, is, it seems to us, just and reasonable."

See, also, Newgass v. Atlantic & D. R. Co., C.C., 72 F. 712, 716, where it was held: " * * * This makes it, in substance, a creditors' bill, and the law is well settled that in such a case, the statute of limitations ceases to run, not at the date of the decree of reference, but at the date of the filing of the bill. Every creditor has, after the filing of the bill, an inchoate interest in the suit, to the extent of his claim being considered a demand, and to prevent his being shut out because he had not obtained a decree within the period of limitation. The authority on which this doctrine is based is the leading case of Sterndale v. Hankinson, 1 Sim. 393, and it is settled, beyond all controversy, for the federal courts, by the case of Richmond v. Irons, 121 U.S. 27, 7 S.Ct. 788 [30 L.Ed. 864]. See pages 52–54, 121 U.S., page 788, 7 S. Ct., which discusses the whole question, and quotes the case of Sterndale v. Hankinson with approval."

It must be kept in mind that the instant suit was brought by the original complainants "on behalf of themselves and all other certificate holders and plan holders".

The contention of Independence and Pennsylvania—that the Circuit Court of Appeals' denomination of the instant action as a "spurious" bill is determinative as to the operation of the statute of limitations —is not sustained by the opinion itself. Indeed, the Circuit Court of Appeals expressly stated that it was not ruling on that question.

Said the Court (108 F.2d at page 55): "We do not at this time express an opinion upon the question whether subscribers who are not now named as party plaintiffs may intervene in the cause in view of the statute of limitations set up in the Act."

Even were we to assume, as contended by Independence and Pennsylvania, that the present proceeding is merely a "spurious" class suit, it would seem, by virtue of Rule 23 of the New Rules of Civil Procedure, that the instant conclusion would not be affected thereby.

Rule 23 itself does not make any distinction between "true", "spurious" or "hybrid" class actions. By its express terms it permits suits to be brought under certain conditions by "one or more" persons representing a "class".

To permit a "class" action to be brought, under Rule 23, and then to bar members of the class (other than plaintiffs) from later joining in the action or from enjoying its benefits, is an inconceivable proposition. That would operate to the detriment of members of the class (other than plaintiffs) who had been lulled into a sense of security in reliance upon Rule 23 which, as has been stated, permits the bringing of class actions without making any distinction between "true", "spurious" and "hybrid" bills.

Under circumstances such as exist here, to compel the members of the class (other than complainants) to determine ab initio whether the action was "true", "spurious" or "hybrid" would be to impose an unfair burden not contemplated by the law.

This suit was filed March 11, 1939. On May 18, 1939, I ruled that this was a class bill; that this court had jurisdiction in equity under the Securities Act of 1933, and granted certain temporary relief then sought. The Circuit Court of Appeals on December 20, 1939 sustained the jurisdiction of this court, but ruled the action to be one at law and not in equity, and specifically declined to express an opinion upon the applicability of the statute of limitations. On December 9, 1940 the Supreme Court of the United States sustained the rulings of this court, and the mandate of the Supreme Court remanding the cause for further proceedings was filed in this court on January 2, 1941.

Thus, almost two years passed between the filing of the "class" action and the resumption of the hearings and motions now under consideration. All of these proceedings were widely publicized and, indeed, the record of the case discloses that notice of the filing of the original suit by the original complainants "on behalf of themselves and all other certificate holders and plan holders" was sent to each and every plan holder by Independence. Again I say that under all these circumstances it is incomprehensible that the statute of limitations of the Securities Act could be or should be invoked.

(2) The extent of relief permissible under the action; and

(3) The nature or position of the assets held by Pennsylvania as trustee under the trust agreement with Capital Savings Plan, Inc., and in its capacity as custodian under Independence Trust Shares Purchase Plans.

These two questions are inter-related and must be considered together in ruling on the motion for the injunction.

Pennsylvania vigorously contends that the assets in its possession are "trust assets" and as such beyond reach of this court. In addition, Pennsylvania contends that it has properly administered the trust assets, and points to the finding in my opinion of May 18, 1939, 27 F.Supp. at page 771: "True, there is no charge here that ·The Pennsylvania Company, &c., has been guilty of any misconduct, neglect or mismanagement and no testimony thereof."

In this connection, attention must be called to the fact that after return of the Supreme Court's mandate and the resumption of the proceedings before me, and during the latter, that the plaintiffs moved to amend the· complaint, the amendments alleging among other things that from the very inception of the operation of Capital Savings Plan, Inc., in 1930, that Pennsylvania entered into a scheme with Capital Savings Plan, Inc., "to defraud" the complainants and other plan holders; that the various trust agreements between Capital and Pennsylvania were entered into as part of the scheme "to defraud"; that Pennsylvania and Independence "entered into secret supplemental agreements dated June 28, 1938 and December 16, 1938, providing for increased and additional charges made and received by the trustee for the acts performed by it under the said trust agreements"; that the plan holders "have and had no knowledge of these secret trust agreements imposing the additional and increased charges, and no notice thereof was given by the trustee to plan holders"; that Independence and Pennsylvania "are trustees ex maleficio and are therefore improper agencies to handle, liquidate or distribute the assets equitably belonging to complainants and other subscribers."

Pennsylvania has moved to strike the amendments above mentioned, and also has moved to strike testimony which the plaintiffs have offered and which they contend sustains the allegations in the amendments.

Without disposing of all the proposed amendments—since that is not essential to my ruling on the motion for the injunction—it is sufficient to note that the testimony clearly establishes the important fact that by agreements between Pennsylvania and Independence in 1938, which were not disclosed to plan holders, Pennsylvania increased its charges to the plan holders.

It may be stated at this point that I am in agreement with the contention of Pennsylvania that the assets held by Pennsylvania for plan holders are "trust assets" and that no plan holders, by sustaining a claim against Independence or Pennsylvania, can in any way thereby obtain any interest in the trust assets held for other plan holders. This is so even though the particular trust assets are not "earmarked" for the benefit of any particular plan holders.

The Independence Trust Shares held in the trust for contract certificate holders are held for their benefit in accordance with the number of shares noted on the respective accounts kept for each contract certificate holder.

Pennsylvania, by the use of computating machines, figures each day the exact number of Independence Trust Shares which it has purchased for each Plan Holder whose money has been invested, and by the same machine enters the exact number of Trust Shares purchased on the separate card record for the particular plan. The machine also enters the Share balance (i. e., the total Trust Shares then and theretofore purchased, less Trust Shares withdrawn or liquidated) and the number of the payment involved: see Paragraph 5, "Statement of Facts to be read into the record as admitted".

The certificates for the Trust Shares purchased for the Capital Savings Plan holders are registered in the name of Pennsylvania as trustee under the proper trust agreement. The separate card record for each plan at all times shows how many Trust Shares are held at any one time for each plan holder. The certificates are not held in separate Trust Share certificates for each plan: see Paragraph 6, Statement, supra.

The procedure above outlined is in accordance with the trust agreement of May 1, 1934, which provides that the trustee shall "hold in trust the Trusteed Property so purchased by it from time to time for the Investor". Section 2 of Article II of the Agreement provides that "the Trustee shall hold in its name as Trustee all Trusteed Property purchased by it, in Trust, for each of the several Investors in the proportions to which they may be respectively entitled * * *."

Section 3 of Article II of the Agreement provides that "the Trustee shall collect all payments, dividends, and/or distributions from time to time made upon the Trusteed Property, and shall * * * apply the same to the purchase of available additional Trusteed Property and likewise hold the same in trust for the several Investors". See also Sections 4, 5, 6, 7 of Article II.

Section 7 of Article IV specifically provides that "nothing herein contained shall be deemed to require the Trustee to hold any part of the Trusteed Property for any particular Investor or to segregate the proportionate interest of any Investor in the Trusteed Property until Contract Certificates therefor shall be surrendered to the Trustee for cancellation".

Section 4 of Article X states: "The Investor, by becoming a party to this Trust Agreement, appoints the Trustee his true and lawful attorney to perform and carry out the terms hereof and to purchase, hold, sell and/or transfer in the manner, for the purposes and at the times herein set forth that portion of the Trusteed Property to which the Investor is or may become entitled, hereby ratifying and confirming all that his said attorney shall lawfully do by virtue hereof."

I have discussed the May 1, 1934 Agreement in view of the fact that the overwhelming majority of the plans were sold since and under that Agreement.

It should be noted that under the "Agreement and Declaration of Trust" of April 2, 1930—the first agreement between Independence and Pennsylvania—that Section 1 of Article II provides that "the Trustee shall hold, administer and apply all Deposit Units for the use and benefit of the Depositor (Independence), and other *and subsequent holders of Trust Share Certificates hereinafter provided for * * *.*"

The fact that the assets held by Pennsylvania are "trust assets" does not, however, preclude me from acting with respect to these assets as prayed for in the injunction.

The conclusion is inescapable, and I so stated in my opinion of May 18, 1939, that the testimony in this case overwhelmingly substantiated the allegations in the bill of complaint that there were untrue statements made to purchasers in the sale of contract certificates; that there was concealment of fact, of which untruths and concealments the purchasers were una-

ware; that there was a concealment of charges made by Independence Shares Corporation, and its predecessor, Capital Savings Plan, Inc. Additional facts disclosed by the evidence are that the management of the trust shares and the underlying stocks which comprised the Deposit Units is solely in Independence and not in the control of Pennsylvania; that Independence in its discretion can sell any of the underlying securities; that Pennsylvania does not select the investments; that there was a $200,000 loss—approximately 25. per cent of the money they paid in—to plan holders in the sale of seven of the 42 underlying securities; that in 1938, by letter from Pennsylvania to Independence, and concurred in by Independence, the existing Trust Agreements were amended to permit Pennsylvania to charge an increased commission on income and that this change in the Trust Agreements and the increase in charges was without the consent of the plan holders affected; and finally, that very sizable charges for "legal" service have been assessed by Pennsylvania against the funds of the plan holders without the knowledge and consent of the plan holders.

The increase in commission charges and the charging of the legal fees is in express violation of several provisions in the various agreements between Pennsylvania and Independence to which plan holders are parties under the terms thereof.

Section 1, Article II, Trust Agreement of May 1, 1934, provides that the 25-cent deduction by Pennsylvania from each $10 monthly payment by plan holders (plus certain other charges therein specifically enumerated) shall "cover all legal, administrative and collection expenses * * *."

Section 1, Article IX of the May 1, 1934 Agreement, captioned "Amendments and Supplemental Agreements", specifically provides that "no such alteration, change, restriction or enlargement shall affect the rights of the holders of Contract Certificates issued prior to the date of such alteration, change or enlargement".

Section 5, Article VII of the agreement of April 2, 1930, provides that "the Trustee shall not be entitled to receive any reimbursement for expenses incurred by it hereunder out of the deposited property except as in this Agreement expressly provided".

It seems highly desirable under all the circumstances that I act to maintain the status quo with respect to the existing situation until final disposition of the ques-

tions still pending, especially the question of solvency or insolvency of Independence.

■ Should I dismiss the exceptions to the master's report finding Independence insolvent and appoint a receiver for Independence, that will undoubtedly affect each and every plan holder. In the event that a receiver is appointed ultimately for Independence and that corporation is liquidated, it of course will no longer be able to discharge its functions under the existing Trust Agreement between Independence and. Pennsylvania. While Pennsylvania under the trust agreements may in its discretion assume the functions of Independence (purchase of underlying stocks, creation of Deposit Units, marketing operations, etc.), it is an open question whether or not Pennsylvania, which is primarily a banking and trust institution, will do so, and further whether it has the power to do so under its charter and under existing law. To permit further investments of the monthly payments made by plan holders, subject as they are to the very considerable "loads", deductions and charges, authorized and unauthorized, now being made by both Pennsylvania and Independence, in view of the situation above described, would jeopardize the interests of the plan holders.

In addition, as was pointed out in Pennsylvania's brief (p. 37) on the appeal to the United States Supreme Court, in the event of the appointment of a receiver for Independence "The market for Independence Trust Shares would be non-existent, and if the market prices of the underlying stocks declined thousands of dollars might be lost".

It must be emphasized that since these proceedings have started, approximately one third of the plan holders have withdrawn at very considerable loss to themselves; another third have stopped making any payments; and only a third are on an active basis. The record discloses that many plan holders who have withdrawn have received or are entitled to receive only a fraction of their investments. It must be kept in mind, too, that Independence is in sole and exclusive control with respect to the right to sell shares of underlying securities. It is the real trustee, with Pennsylvania occupying a mere custodial relationship with respect to the trusteed property. As previously stated, Independence sold seven of the 42 underlying securities with a resulting $200,000 loss to plan holders; while the plan holders suffered this loss, Independence made a very handsome profit out of the transaction by reason of the fact that it made a seven and one half per cent charge on the re-investment of the proceeds of the seven sold securities. Should Independence decide again to sell underlying securities which may be purchased with future payments by plan holders, they will again be subjected to a seven and one half per cent load on the re-investment of that money, in addition to the seven and one half per cent load which is charged on the original investment.

Thus we have here a situation where Independence, which has been guilty of the fraud and concealment and misrepresentation previously described, is in the "driver's seat" with respect to the property on hand and the money of the plan holders which may be paid in the future.

The plan holders have placed their complete reliance in Independence and Pennsylvania—the record abounds with testimony that the high pressure sales methods of Independence portrayed Pennsylvania in the role of "guarantor" and in complete and sole control of the investment of funds paid in by plan holders. See Securities and Exchange Commission v. Capital Savings Plan, Inc., and Independence Shares Corporation, D.C.[1]

In connection with the unauthorized and concealed increased charges made by Pennsylvania, it is well settled that equity will assume complete jurisdiction where there have been such dealings between beneficiaries of a trust and the trustee as was evidenced in this case.

As was said in the recent case of Ringer, Adm'x, v. Finfrock, 340 Pa. 458, 461, 462, 17 A.2d 348, 350: "The existence of this confidential relation was purely a question of fact. Such a relation is not restricted to any particular personal association. It may exist as a matter of law in certain recognized fiduciary relations, as in the case of trustee and cestui que trust, attorney and client, and guardian and ward. It may also exist as a matter of fact wherever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on the one side, or weakness, dependence or justifiable

---

[1] No opinion for publication.

trust, on the other. See McCown v. Fraser, 327 Pa. 561, 564, 565, 192 A. 674; In re Null's Estate, 302 Pa. 64, 68, 153 A. 137; Leedom v. Palmer, 274 Pa. 22, 25, 117 A. 410; Restatement, Trusts, Section 2(b)."

This is a proceeding in equity, and it is incumbent upon me to take such action as may be imperative to safeguard not only the corpus of the estate as it exists today, but also to safeguard all of the parties and all others who may possibly be affected by this suit.

█ It is well settled that once equity has acquired jurisdiction, that all phases of the problem and all possible remedial relief can be granted. This is so, even though the relief involved is only an incident to the jurisdiction. The rule is succinctly stated in Ober v. Gallagher, 93 U. S. 199, 206, 208, 23 L.Ed. 829: "The court had, therefore, jurisdiction of the suit as originally brought; and this jurisdiction was not defeated by the amendment which introduced the notes, not in judgment, but secured by the lien, into the case. *Having obtained rightful jurisdiction of the parties and the subject-matter of the action for one purpose, the court will make its jurisdiction effectual for complete relief.* Story's Eq. 64k. If the amendment had not been made, the court would in its decree have taken care to protect the rights of the holders of the outstanding notes; and that is all it is called upon to do by the amendment. *Having jurisdiction for one purpose, it may be retained for all within the general scope of the equities to be enforced.*" (Emphasis supplied.)

Ober v. Gallagher, supra, was cited with approval in Ward v. Todd, 103 U.S. 327, 328, 329, 26 L.Ed. 339, with the statement: "The amendment was germane to the matters set forth in the original petition, and the court, having once obtained rightful jurisdiction of the parties, could retain it until complete relief was afforded within the general scope of the subject-matter of the action. Ober v. Gallagher, 93 U.S. 199 [206, 23 L.Ed. 829]."

In United States v. Union Pacific R. Co., 160 U.S. 1, 51, 16 S.Ct. 190, 209, 40 L.Ed. 319, the rule was stated as follows: "These principles are abundantly sustained by the authorities. In 1 Pom.Eq.Jur. § 181, many adjudged cases are cited in support of the proposition that 'if the controversy contains any equitable feature, or requires any purely equitable relief which would belong to the exclusive jurisdiction, or

involves any matter pertaining to the concurrent jurisdiction, by means of which a court of equity would acquire, as it were, a partial cognizance of it, the court may go on to a complete adjudication, and may thus establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority.' "

Again, in Siler v. Louisville & N. R. Co., 213 U.S. 175, 190, 191, 29 S.Ct. 451, 455, 53 L.Ed. 753, it was held:

"The Federal questions as to the invalidity of the state statute because, as alleged, it was in violation of the Federal Constitution, gave the circuit court jurisdiction, and, *having properly obtained it, that court had the right to decide all the questions in the case, even though it decided the Federal questions adversely to the party raising them, or even if it omitted to decide them at all, but decided the case on local or state questions only.*

"This court has the same right, and can, if it deem it proper, decide the local questions only, and omit to decide the Federal questions, or decide them adversely to the party claiming their benefit. Horner v. United States, 143 U.S. 570, 576, 12 S.Ct. 522, 36 L.Ed. 266, 268; Fallbrook Irrigation Dist. v. Bradley, 164 U.S. 112, 154, 17 S.Ct. 56, 41 L.Ed. 369, 387; Penn Mut. L. Ins. Co. v. Austin, 168 U.S. 685, 694, 18 S.Ct. 223, 42 L.Ed. 626, 630; Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482, 485; Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278; People's Sav. Bank v. Layman [C.C.], 134 F. 635; Michigan R. R. Tax Cases [C.C.], 138 F. 223. Of course, the Federal question must not be merely colorable or fraudulently set up for the mere purpose of endeavoring to give the court jurisdiction. Penn Mut. L. Ins. Co. v. Austin, 168 U.S. 695, 42 L.Ed. 630, 18 S.Ct. 223; Michigan R.R. Tax Cases, supra." (Emphasis supplied.)

See, also, Ball v. Tompkins, C. C., 41 F. 486, 489, where the Court held that by virtue of their chancery jurisdiction, the Federal courts have jurisdiction over the administration of estates when the requisite citizenship and other conditions exist.

In Williams v. Collier, D.C., 32 F.Supp. 321, 324, I stated the rule as follows: " * * * The doctrine is well established that once the jurisdiction of an equity court attaches, it attaches for all purposes and the court will give complete relief * * *."

It may be mentioned at this point that several plan holders who have been permitted to intervene have joined with Independence and Pennsylvania in opposing the motion for the injunction. These intervening plan holders have offered no testimony.

Subsequent to the filing of the motion for injunction, Independence raised the question of the applicability of the Securities Act of 1933, contending that all of the plans "were sold in Pennsylvania by local salesmen employed by Pennsylvania corporations" and that "consequently the plaintiffs have not satisfied the burden incumbent upon them of proving the jurisdictional facts necessary to give the court jurisdiction over the case and for this reason it should be dismissed." The record is replete with instances too numerous to mention of the use of the mails by both Independence and Pennsylvania. The same contention was advanced in Securities and Exchange Commission v. Timetrust, Inc., D.C., 28 F.Supp. 34, and it was there dismissed as being without merit. See, also, Gross v. Independence Shares Corporation, D.C., 36 F.Supp. 541, in which the same contention was advanced and dismissed by Judge Bard of this District.

I am of the opinion that the motion for injunction should be granted and that the injunction should issue.

In summary, the record conclusively establishes that Independence is the real trustee; that it buys the underlying stocks which comprise the Deposit Units; that it creates the Independence Trust Shares; that it manages in the fullest sense of the word the monies paid in by the plan holders; that after the investment it can in its discretion sell any of the underlying securities; that while the emphasis given to the words "trustee" and "trusteeship" in the various transactions would naturally lead to the assumption that the functions of Pennsylvania as "trustee" afforded to the investment the protection of supervision and management ordinarily ascribed to a trustee, that the fact is that Pennsylvania performs purely ministerial duties, and that Independence exercises exclusive domination and control.

In view of the potentialities of the situation with respect to a receivership for Independence, previously referred to in this opinion, and especially in view of the heavy "load" to which payments by plan holders are subjected, the exercise of equit-able jurisdiction makes imperative the granting of the motion for the injunction, and the motion is accordingly granted and the injunction issued.