Kees, Executor, *v.* Green, Appellant.

Argued April 19, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*John J. Gain,* for appellant.

*Harry J. Gerber,* for appellee.

OPINION BY MR. JUSTICE BELL, September 25, 1950:

Plaintiff, as executor of the will of Thomas J. Corson, deceased, filed a bill in equity to compel defendant to transfer and deliver back to him certain shares of stock and the money delivered under an Agreement dated August 30, 1948 by decedent to defendant, together with an account thereof. The court granted the relief prayed for on the grounds: (1) that Corson did not comprehend the nature and consequences of the agreement; and (2) that it was obtained by a violation of confidential relationship; and (3) by undue influence. Defendant took this appeal.

The facts in this case are so important that it is necessary to recite them at length.

Thomas J. Corson died on December 17, 1948 at the age of 86 years. Corson lived for 35 years with Mrs. Dickinson at her home, 2824 North Mascher Street, Philadelphia. The defendant, who was no relation to Corson, lived with Mrs. Dickinson, his grandmother, from the time he was 6 years old until his marriage in 1941. Corson bequeathed to Mrs. Dickinson, in his will of February 2, 1944, $5,000 and half of his residuary estate. In that will he bequeathed the defendant $100.

In October 1947, Corson visited his attorney, Mr. Troutman, to execute a codicil to his 1944 will, to correct the middle initial in the name of Ella Dickinson, and to reduce the legacy given to one of his nieces. On January 6, 1948, ten days after the death of Mrs. Dickinson, Corson again visited Mr. Troutman for the purpose of changing his will. On *January 7, 1948* Corson executed a new will making substantially the same bequests as he had previously made to churches and to his nieces, but *increasing his bequest to the defendant from $100 to $200* and leaving his entire residuary estate to Hess (to whom he had previously left half of his residuary estate). Troutman noticed that Corson had failed physically, appeared to be in a daze and did not seem to know what he wanted. His condition was such that Troutman even then had grave doubts as to his testamentary capacity but finally drew the new will because it contained substantially the same bequests as in the earlier will except for the change necessitated by the death of Mrs. Dickinson. One week later, on *January 13, 1948, Corson, accompanied by* plaintiff, plaintiff's wife, and by *defendant,* went to see a new attorney Mr. Gerber for the purpose of having him draw a new will. This will contained substantially the same bequests to churches and to relatives but it increased the bequest to defendant from *$200 to $2,000* and left the residuary estate in equal shares *to defendant,* to May Kees, wife of plaintiff, and to four of Corson's relatives. It also named plaintiff as executor. At the time of this visit, defendant gave Gerber *a memorandum in defendant's handwriting* which provided for a few bequests and ended with the words *"Prescott Green to receive the remainder".* Green then stated to the attorney: "This is exactly how Mr. Corson wants his will drawn". Mr. Gerber said that that was not the way wills were made in his office. As a consequence, when the parties were leaving, defendant said to Kees, "That

fellow Gerber thinks he is pretty smart but I will get my share". On March 11, 1948 Corson returned to Gerber's office and had him prepare a codicil (which decedent promptly executed) to his will of January 13, 1948 in which codicil he reduced his bequest to defendant from $2000 to $1000.

Defendant inherited from Mrs. Dickinson her Mascher Street home and he and his wife moved in there to live. The Chancellor found that Corson was no longer happy there and he appealed to his next door neighbors to take him in, saying he could not stand living any longer with defendant and his wife. When these neighbors could not take decedent in, he went to live with Kees for nearly five months. During this time decedent did not visit defendant nor defendant visit him. While at Kees' home, Corson's infirmities and senility increased and he was under the constant care of his physician, Dr. Shore. On August 23, 1948, defendant called at Kees' home and induced Corson to go back "home" (2824 North Mascher Street) with him. That house was home to Corson and the Kees' house had seemed strange. Corson wanted to live and die in the house where he had lived so long. The Chancellor found that it was the old familiar house Corson longed for and not the society of defendant or his wife. Although Corson needed medical attention, defendant did not call in Corson's physician, Dr. Shore, but waited until September 20, 1948 and then took Corson to defendant's own physician, Dr. Vaughn.

*About a week* after Corson returned to defendant's home, defendant and Corson went to Corson's bank and removed all of decedent's stock certificates from decedent's safe deposit box. Corson then assigned said certificates to himself and defendant as joint tenants with right of survivorship and Corson then had the Western Savings Fund Society guarantee Corson's signature to said assignments.

On *August 30, 1948,* defendant took Corson and the securities assigned as aforesaid to the office of Mr. Barba, an attorney who was selected by defendant and unknown to Corson. Barba then prepared, and Corson and defendant executed, on August 30, 1948, an agreement which recited that decedent wanted to live in the Mascher Street house until his death, and then provided that defendant would provide room and board, light, heat, laundry and care for the balance of Corson's life (Corson then being 86 years of age and in a condition where it was apparent he would not live much longer); that Corson would pay $15.00 a week for his board alone; *that Corson's bank accounts totaling $5531.46, and his securities totaling $10,890. had contemporaneously been transferred to Corson and defendant "as joint tenants with right of survivorship";* that the defendant would join in selling any of the securities if necessary for Corson's well-being; and that on Corson's death the defendant would pay to two named churches and to certain relatives of Corson's sums totaling $2,500., about one-sixth of the money Corson turned over to defendant. Incidentally, Corson had previously paid defendant only $15.00 a week for room and board, light, heat, laundry and care.

At the time Mr. Barba drew the agreement, he testified, and the Chancellor found, that he fully realized that the agreement was over Corson's head. Barba further testified that after he suggested the kind of agreement which was executed that day, he asked Corson "whether that is what he wanted to do. He said that is what he did want to do, but he didn't know anything about the agreement, it was over his head, but if it did what he wanted, namely provide for a disposition of his property after his death, and would keep him from being dragged to lawyers' offices, that is what he wanted". Barba had Corson sign the contract because he *"was afraid that Corson was subject to undue influ-*

*ence"* and *he believed that Corson "might be pressured into doing almost anything if the right person was with him at the right time"*. Corson obviously did not have the benefit of independent counsel or independent advice. Moreover, at the conference between Corson and Barba, Green was present until after Corson had stated how he wanted to dispose of his estate; Green then left the room and, after the memorandum outlining the agreement was prepared, came back into the room and thereafter participated in the discussions.

The Chancellor further found that at that time Corson's weakness of mind was so great that he lacked the mental capacity to understand what he was doing or to realize the nature and effect of his actions. At the most he intended to provide for a disposition of his property after his death and not to make an inter vivos gift to the defendant or to deprive himself of his property during his lifetime. After the contract was signed, Barba sent the aforesaid stock certificates to a broker's office for transfer and they were never thereafter returned to decedent.

Defendant's obvious intent to acquire all of decedent's property is evident from the further fact that on October 11, 1948 he withdrew $2,450. of decedent's money from the Western Saving Fund Society and used it to purchase an automobile for himself; and he also withdrew other sums totaling $775., in addition to cashing the various checks which Corson received from time to time.

Dr. Shore testified that Corson, when in his care and at all times thereafter until his death, suffered from prostatic hypertrophy, Parkinsonism, advanced arteriosclerosis, sclerosis of the vessels of the brain causing anemia of the brain, bone-conduction deafness, bi-lateral cataracts, senility, and headaches of increasing severity. Corson could not remember from one visit to another who his doctor was. Dr. Shore testified and *the Chan-*

*cellor found that Corson was not competent to take care of his own affairs and that he was in a condition where he was likely to become a victim of designing persons.*

Dr. Vaughn first saw decedent in *September 1948*. Dr. Vaughn found the same medical infirmities in Corson as did Dr. Shore; he also admitted that Corson could scarcely see; that he had to be shouted at in order to hear; and that when he was taken to the hospital in November 1948 he was almost a raving maniac when defendant was not present. Dr. Vaughn testified that in his opinion Corson was competent to transact the ordinary everyday business of taking care of his own property, but when the Court immediately asked, "taking care of his money and estate?", the witness answered, "He was able to take care of his health". The Chancellor also found that defendant was an aggressive, forceful young man who set out to acquire Corson's property and, because of the latter's weakness and dependence, succeeded; that a confidential relationship existed between Corson and defendant; and that the latter obtained the former's property by undue influence.

Although there are a myriad of cases involving confidential relationship and undue influence, the courts have found it impossible to define precisely these terms. Perhaps the best definition, so far as the facts in the instant case are concerned, of what constitutes, in the eyes of equity, a confidential relationship, is found in *Shook v. Bergstrasser,* 356 Pa. 167, 170, 51 A. 2d 681, where the Court, quoting from *Hamberg v. Barsky,* 355 Pa. 462, 50 A. 2d 345, said: " 'Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence,

or, on the other, weakness, dependence or trust, justifiably reposed; . . . . In some cases the confidential relation is a conclusion of law, in others, it is a question of fact to be established by the evidence': Leedom v. Palmer, 274 Pa. 22, 25, 117 A. 410, 411, 412; Null's Estate, 302 Pa. 64, 68, 153 A. 137, 139; McCown v. Fraser, 327 Pa. 561, 564, 565, 192 A. 674, 676; Ringer v. Finfrock, 340 Pa. 458, 461, 462, 17 A. 2d 348, 350. 'A confidential relationship . . . exists wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest': Drob v. Jaffe, 351 Pa. 297, 300, 41 A. 2d 407, 408."

Generally speaking, the burden of proving confidential relationship or lack of capacity or undue influence rests upon the person asserting the same: *Teats v. Anderson,* 358 Pa. 523, 58 A. 2d 31; *Stewart Will,* 354 Pa. 288, 47 A. 2d 204; *Stepp v. Frampton,* 179 Pa. 284, 36 A. 177; *Leedom v. Palmer,* 274 Pa. 22, 117 A. 410. Nevertheless, if a confidential relationship is shown to exist, then even in the absence of evidence of actual fraud or of mental incapacity, the burden is on the dominating party to prove by clear and satisfactory evidence that the contract was the free, voluntary and independent act of the other party, entered into with an understanding and knowledge of its nature, terms and consequences; and that the entire transaction was unaffected by undue influence or imposition or deception or fraud: *McCown v. Fraser,* 327 Pa. 561, 192 A. 674; *Matthaei v. Pownall,* 235 Pa. 460, 84 A. 444; *Darlington's Appeal,* 86 Pa. 512; *Stepp v. Frampton,* 179 Pa. 284, 36 A. 177; *Thorndell v. Munn,* 298 Pa. 1, 147 A. 848; *Null's Estate,* 302 Pa. 64, 153 A. 137; *McConville v. Ingham,* 268 Pa. 507, 112 A. 85; *Lochinger v. Hanlon,* 348 Pa. 29, 33 A. 2d 1; *Corrigan v. Conway,* 269 Pa. 373, 112 A. 466; *Williams's Estate,* 299 Pa. 440, 149 A. 728.

There was ample evidence to sustain the Chancellor's findings that Corson, because of his weakened mentality and infirmities, did not comprehend the nature or consequences of his transactions with the defendant; and that the defendant occupied a confidential relationship toward Corson and shockingly violated this relationship.

Was the defendant likewise guilty, as the Chancellor and the court below found, of undue influence?

In order to constitute undue influence there must be evidence, direct or circumstantial, of coercion or improper conduct subjugating one's mind to the will of the person operating upon it; weakness of mind or an impaired condition, without more, is not sufficient to establish undue influence; there must be fraud or threats or misrepresentations or inordinate flattery or deception or excessive importunity or imposition or other improper conduct sufficient to dominate or control the other person's mind: *Cookson's Estate*, 325 Pa. 81, 188 A. 904; *Withers v. Withers*, 363 Pa. 431, 70 A. 2d 331; *Teats v. Anderson*, 358 Pa. 523, 58 A. 2d 31; *Freed's Estate*, 327 Pa. 572, 195 A. 22.

Whether undue influence was exercised must often be inferred from the facts and circumstances of the particular case: *Withers v. Withers*, 363 Pa. 431, 70 A. 2d 331; *Teats v. Anderson*, 358 Pa. 523, 58 A. 2d 31; in this connection, acts and conduct are sometimes as important as spoken words in determining undue influence or mental capacity: *Denner v. Beyer*, 352 Pa. 386, 42 A. 2d 747; *Wingert Case*, 163 Pa. Superior Ct. 616, 63 A. 2d 441; *Ryman's Case*, 139 Pa. Superior Ct. 212, 11 A. 2d 677.

Defendant utterly failed to sustain his burden of proof that this grossly unfair agreement and his other transactions were unaffected by undue influence. The Chancellor who heard and saw the witnesses did not believe the defendant or his two principal witnesses.

This shattered whatever case defendant might have had, for an appellate court will not disturb a Chancellor's findings of fact which are based upon the credibility of the witnesses and have adequate evidence to support them, especially where such findings are approved by the court en banc: *Deal's Estate*, 321 Pa. 484, 184 A. 453; *Honan v. Donaldson*, 331 Pa. 388, 200 A. 30; *Markovitz v. Markovitz*, 336 Pa. 136, 8 A. 2d 42.

Decree affirmed at appellant's cost.