### Ervin v. Mutual Life Insurance Co. Of New York

*Heath L. Allen,* of *Metzger, Hafer, Keefer, Thomas & Wood,* for plaintiffs.

*Clyde W. McIntyre,* of *McNees, Wallace & Nurick,* for defendant.

LIPSITT, J., June 29, 1971.—In this proceeding in equity, Dr. Carl E. Ervin and Marjorie Read Ervin, his wife, ask the court to direct defendant, The Mutual Life Insurance Company of New York (hereinafter called "Mony"), to cancel a certain insurance policy and refund premiums paid in connection therewith and to restore the status of another policy.

A factual background is necessary to understand the nature of the law suit. Plaintiff, Dr. Carl E. Ervin, owned a Mony insurance policy dated October 1, 1925, in the face amount of $10,000. Under this policy, dividends were accumulated. Late in 1963, an agent for defendant company, Thomas Allison, met with Dr. Ervin. There is some dispute as to how this meeting was initiated and its intended purpose. Mr. Allison testified it was a service call. At the time, he said, the dividends were being used to buy additional insurance, and he wanted to discuss the possibility of increasing Dr. Ervin's or his family's insurance protection. Dr. Ervin testified he contacted the company because he desired to obtain paid-up additions to the amount of his insurance for Federal income tax reasons. According to Dr. Ervin, Mr. Allison said Mony procedures did not provide for the desired arrangement but suggested the same result could be reached if

another life insurance policy was purchased and the dividends accumulating on the older policy as well as the dividends accruing on the new policy were used to pay the premiums. As a result of the discussions between Dr. Ervin and Mr. Allison, a second policy dated March 30, 1964, in the amount of $10,000 was purchased in the name of Marjorie Read Ervin insuring the life of her husband, Carl E. Ervin. Dr. Ervin was then 73 years old and fortunately has remained in good health. But because of his age, a large premium was necessary to maintain the policy in force. Sources other than accumulated dividends were required to pay the premiums. By borrowing on the policies, Dr. Ervin will eventually reduce the amount of the gross proceeds from the policies to a point where there is less for his estate and family than there would have been if he had retained only the original policy. The seeds of a legal action become apparent. Plaintiffs feel a bad bargain was made. They urge that the agent involved was in a position of trust and used the confidence reposed in him to secure an advantage and that Dr. Ervin was a victim of fraud and misrepresentations. Defendant argues that when the second policy was purchased, there was insurance protection in an amount in excess of $20,000 and contrary to the contentions of plaintiffs, defendant claims Dr. Ervin was not defrauded and, moreover, even after he was fully aware of the reality of the situation by his own testimony, the premiums were paid and the protection afforded by the new policy continued.

A hearing was held and arguments submitted on briefs. After due consideration of the pleadings, the testimony and the arguments, we make the following

## FINDINGS OF FACT

1. Plaintiff, Marjorie Read Ervin, is the owner of Mutual Life Insurance Company of New York policy

No. 8973129, dated March 30, 1964, and issued April 14, 1964, insuring the life of her husband plaintiff, Carl E. Ervin, in the amount of $10,000.

2. Plaintiff, Carl E. Ervin, a physician in the active practice of medicine with offices located in Harrisburg, Pa., is both the owner and insured of a Mony policy No. 3418486 dated October 1, 1925, in the face amount of $10,000.

3. Dr. Ervin's 1925 policy provided for reinvestment of dividends to purchase paid-up insurance, and he received annual statements showing the cash value of accumulated dividends and the value of paid-up insurance he had purchased with accumulated dividends.

4. Dr. Ervin desired all dividends accumulated under his insurance policies to be used for additional paid-up life insurance.

5. In the latter part of 1963, Dr. Ervin met with the representatives of Mony, one of whom was defendant's agent, Thomas Allison.

6. In 1963, Dr. Ervin, under his 1925 policy, owned additional paid-up insurance in the amount of $2,449 purchased from accumulated dividends.

7. At the initial meeting between Dr. Ervin and Mr. Allison, an additional insurance policy in the amount of $5,000 was proposed.

8. Several weeks later, Dr. Ervin was advised by Agent Allison that the company would not approve a $5,000 policy but would issue a $10,000 policy if Dr. Ervin could pass a physical examination.

9. Prior to taking the physical, Dr. Ervin was presented with a chart analyzing the amount that Dr. Ervin would be required to pay for premiums on the new policy over and beyond the amount that he would have available in new or accumulated dividends, and the chart showed the annual premium of $1,234 would be covered by dividends only during the first year of

the policy and thereafter he would have to raise various amounts to cover the premium after deducting dividends.

10. Dr. Ervin passed the required physical examination and at the time the policy was delivered he was also given a revised schedule of payments which subsequently served as the basis for payments by Dr. Ervin and which also showed amounts that would be needed to pay for the premiums each year. This statement was delivered by Agent Allison personally and reviewed with Dr. Ervin.

11. The annual amount of the premium also appeared on the policy as delivered.

12. Although the forms or charts presented to Dr. Ervin were not completely clear and contained some language not readily understood by a layman, including on the first form presented a profit column, a designation not usually associated with insurance, it is discernible that the use of the cash value of dividend additions on the 1925 policy and future dividends from both policies were contemplated to aid in the financing of the premiums on the new policy.

13. Mr. Allison recommended to Dr. Ervin a program whereby the premium on the new policy was financed by surrender of paid-up additions, dividends on both policies and loans on both policies. He personally delivered to Dr. Ervin the necessary surrender and loan forms in 1965 and 1966.

14. Dr. Ervin contacted Mr. Allison to make arrangements for obtaining funds to pay the premiums needed and was supplied with forms he signed for this purpose.

15. Marjorie Read Ervin joined with her husband, Dr. Ervin, in signing a loan agreement to pay for premiums on the new policy, said loan form being dated June 3, 1966.

16. Mr. Allison never advised Dr. Ervin that the funding method being used to pay the premiums on the new policy would, after a period of years, reduce the combined death benefits of the two policies below the benefits receivable under the old policy.

17. Dr. Ervin paid the premiums and signed the loan forms for four years without expressing dissatisfaction under the arrangement.

18. All premiums have been paid on the new policy.

## DISCUSSION

The first contention advanced by plaintiffs is that Mr. Allison was an insurance counselor and, as such, a confidential relationship existed between him and Dr. Ervin. "Because of this position of trust, it is urged that even in the absence of evidence of actual fraud, the burden is on the dominating party to prove by clear and satisfactory evidence that the contract was the free, voluntary and independent act of the other party entered into with an understanding and knowledge of its nature, terms and consequences; and that the entire transaction was unaffected by undue influence or imposition or deception or fraud: Kees, Executor v. Green, 365 Pa. 368 (1950).

To place this role on defendant, it must be shown that a confidential relationship did, in fact, exist. This status is, of course, not confined to any specific association of parties. It has been held to be "one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. . .": Shook v. Bergstrasser et ux., 356 Pa. 167, 171 (1947).

The record simply does not establish an affinity between the parties to which the proposed legal propositions are applicable. It could hardly be found that Dr. Ervin, a practicing physician for many years, placed such positive trust in an insurance man, whom he had never seen before and who, in addition to giving advice, is a salesman, so as to be subjected to undue influence.

Plaintiffs rely principally on the theory that Dr. Ervin was induced to purchase the new policy through fraud or misrepresentations. If this be shown, it is argued, equity should be available to abrogate the new policy and restore the old policy to give Dr. Ervin the contractual values of face value and paid-up additions he would have enjoyed under the old policy alone. The chief basis for this plea of deception is because Dr. Ervin was not told his insurance coverage would be steadily decreasing by reason of the funding method employed. To support plaintiffs, there is evidence of the sales charts shown to Dr. Ervin which did not depict the complete situation and contained some puffery. But sufficient information was there which did show the need for funds to meet the premium payments after the first year. Actually, no representation of any kind was made about diminishing factors. Under any system of purchasing insurance, the net coverage obtained is the difference between the premiums paid and the face amount of the policy whether the premiums are paid in cash or by loan. Dr. Ervin had himself borrowed against his 1925 policy in the 1930's and testified he was aware the loan diminished the net amount of coverage and a loan would involve the payment of interest.

Plaintiffs here argue that Dr. Ervin was induced to enter into the new contractual arrangement through a fraudulent misrepresentation. Pennsylvania law

requires this allegation to rest on evidence that is clear, precise and indubitable: Harrisburg National Bank and Trust Co., Executor v. Continental Casualty Co., 88 Dauph. 188 (1967). Plaintiffs cannot meet this standard of proof. The two charts in dispute plainly reveal that, except for the first year, something in excess of accrued dividends on the two policies had to be paid to make up the premium payment on the new policy. Further, it may be noted Dr. Ervin must have had knowledge of the potential cost as soon as he began paying premiums he did not expect to pay but continued to do so for several years without expressing his displeasure.

The real issue here is one of declining insurance values. And Dr. Ervin has reason to be disappointed, but happily he is still alive. There is always declining value in the sense that as a policy gets older money will have been paid in and thus insurance benefits will be proportionately reduced. When the new policy was purchased in 1964, Dr. Ervin had approximately $21,000 worth of coverage in place of approximately $12,000 existing under the old policy. Dr. Ervin made the choice to substantially increase the amount of his insurance in 1964. There was ample information to advise him if he continued to live the choice of buying insurance would be disadvantageous in comparison with an annual investment or savings program. As a matter of hindsight, the purchase of additional insurance is now viewed as a bad bargain.

We draw the following

## CONCLUSIONS OF LAW

1. A confidential relationship did not exist between plaintiff, Carl E. Ervin, and any representative of defendant, The Mutual Life Insurance Company of New York.

2. There were no material misrepresentations on the part of defendant, The Mutual Life Insurance Company of New York, in the sale of the life insurance policy to plaintiffs, Carl E. Ervin and Marjorie Read Ervin, so as to permit a judicial alteration of the existing contractual relationship between the parties.

In accordance with this discussion, findings of fact and conclusions of law, we enter the following

### DECREE NISI

And now, June 29, 1971, it is ordered, adjudged and decreed that plaintiffs' complaint in equity is dismissed. The prothonotary is directed to enter this decree nisi and give notice thereof to all parties of record or their counsel forthwith. If no exceptions are filed within 20 days after notice of this decree, a final decree will be entered upon praecipe by the prothonotary.